## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 22-cv-24156-BLOOM/Otazo-Reyes

RENÉ GARCIA, *et al.*,

      Plaintiffs,

v.

KERRIE J. STILLMAN, *et al.*,

      Defendants.

_____/

## <u>ORDER ON MOTION FOR PRELIMINARY INJUNCTION</u>

**THIS CAUSE** is before the Court upon Plaintiffs' Renewed Motion for Preliminary Injunctive Relief, ECF No. [19] ("Motion"), filed on December 27, 2022. Defendants filed a Response, ECF No. [35], to which Plaintiffs filed a Reply. ECF No. [42]. The Court held a hearing ("Hearing") on the Motion on January 27, 2023. *See* ECF No. [43]. The Court has carefully considered the Motion, the Response, the Reply, the parties' arguments at the Hearing, the record in this case, the applicable law, and is otherwise fully advised. For the reasons set forth below, Plaintiffs' Motion is granted in part and denied in part.

### I.    INTRODUCTION

On December 21, 2022, René Garcia, Javier Fernández, Crystal Wagar,[1] Mack Bernard, and William Proctor ("Plaintiffs") initiated this case against Florida Attorney General Ashley Moody, Florida Chief Financial Officer Jimmy Patronis, and the following members of the Florida Commission on Ethics: Kerrie Stillman, John Grant, Glenton Gilzean, Jr., Michelle Anchors,

---

[1] On February 14, 2023, Plaintiffs dropped Crystal Wagar as a party because she resigned from her public office as an elected member of the Miami Shores Village Council on December 30, 2022, the day before the challenged laws went into effect. *See* ECF No. [48] at 2.

William Cervone, Don Gaetz, William Meggs, Ed Moore, Wengay Newton, and Jim Waldman ("Defendants"). ECF No. [1]. In their Complaint, Plaintiffs asserts facial and as-applied constitutional challenges to Article 2, Section 8(f) and 8(h)(2) of the Florida Constitution (the "Anti-Lobbying Amendment") and Fla. Stat. §§ 112.3121-112.3122 (the "Implementing Statutes"). *Id.* The Court will refer to the Anti-Lobbying Amendment and Implementing Statutes in combination as the "Lobbying Restrictions."

The Anti-Lobbying Amendment was enacted on November 6, 2018, when 78.9% of Floridians voted in favor of a ballot initiative entitled "Lobbying and Abuse of Office by Public Officers."[2] ECF No. [36-1]. Consequently, Article 2 Section 8 of the Florida Constitution was amended to place significant limits on compensated lobbying by current and former "public officer[s]," whom the Anti-Lobbying Amendment defines as:

> a statewide elected officer, a member of the legislature, a county commissioner, a county officer pursuant to Article VIII or county charter, a school board member, a superintendent of schools, an elected municipal officer, an elected special district officer in a special district with ad valorem taxing authority, or a person serving as a secretary, an executive director, or other agency head of a department of the executive branch of state government.

*Id.* § 8(f)(1).

Section 8(f)(2) prohibits public officers from engaging in compensated lobbying while in office:

> (2) A public officer shall not lobby for compensation on issues of policy, appropriations, or procurement before the federal government, the legislature, any state government body or agency, or any political subdivision of this state, during his or her term of office.

Fla. Const. Art. 2 § 8(f)(2) (the "In-Office Restrictions").

---

[2] Florida Department of State, Division of Election, November 6, 2018 General Election Official Results, *available at* https://results.elections.myflorida.com/.

Section 8(f)(3) extends lobbying restrictions "for a period of six years after vacation of the public position." Fla. Const. Art. 2 § 8(f)(3) (the "Post-Office Restrictions"). However, unlike the In-Office Restrictions, the Post-Office Restrictions are tailored depending on the public officer's former position, as follows:

> a.   A statewide elected officer or member of the legislature shall not lobby the legislature or any state government body or agency.

> b.   A person serving as a secretary, an executive director, or other agency head of a department of the executive branch of state government shall not lobby the legislature, the governor, the executive office of the governor, members of the cabinet, a department that is headed by a member of the cabinet, or his or her former department.

> c.   A county commissioner, a county officer pursuant to Article VIII or county charter, a school board member, a superintendent of schools, an elected municipal officer, or an elected special district officer in a special district with ad valorem taxing authority shall not lobby his or her former agency or governing body.

*Id.* § 8(f)(3).

The Anti-Lobbying Amendment authorizes the Florida Legislature to enact implementing legislation "including, but not limited to, defining terms and providing penalties for violations." *Id*. § 8(f)(5). On May 26, 2022., the Implementing Statutes were signed into law. Implementation of the Constitutional Prohibition Against Lobbying by a Public Officer, 2022 Fla. Sess. Law Serv. Ch. 2022-140 (C.S.C.S.H.B. 7001) at Sec. 3. They create penalties for violations of the Anti-Lobbying Amendment, including "[p]ublic censure and reprimand," "[a] civil penalty not to exceed $10,000," and "[f]orfeiture of any pecuniary benefits received for conduct that violates this section." Fla. Stat. § 112.3122(4). They also define many terms that appear in the Anti-Lobbying Amendment, including "Lobby," "Lobby for compensation," "Issue of appropriation," "Issue of policy," and "Issue of procurement." *See generally* Fla. Stat. § 112.3121. The Implementing Statutes went into effect on December 31, 2022. *Id.* § 112.3122(1).

On December 27, 2022, Plaintiffs moved for a preliminary injunction to preclude enforcement of the Lobbying Restrictions during the pendency of this litigation. *See* ECF No. [19]. Plaintiffs assert that the Lobbying Restrictions violate "core First Amendment rights of free speech, freedom of association, and the right to petition the government for redress of grievances." *Id.* at 4. Defendants respond that the Lobbying Restrictions serve to "nail shut the 'revolving door' between public office and private lobbying," and to prevent *quid pro quo* corruption. ECF No. [35] at 2, 14.

## II.    LEGAL STANDARD

A district court may grant a preliminary injunction only if the movant establishes the following: "(1) a substantial likelihood of success on the merits of the underlying case, (2) the movant will suffer irreparable harm in the absence of an injunction, (3) the harm suffered by the movant in the absence of an injunction would exceed the harm suffered by the opposing party if the injunction issued, and (4) an injunction would not disserve the public interest." *North Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1217 (11th Cir. 2008) (quoting *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1246 (11th Cir. 2002)). "A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the burden of persuasion as to the four requisites." *Keister v. Bell*, 879 F.3d 1282, 1287 (11th Cir. 2018) (quotation marks omitted).

## III.    DISCUSSION

### A.  Likelihood of Success

The Court begins with Plaintiffs' likelihood of success on the merits, which is "generally the most important factor" in the preliminary injunction analysis. *NetChoice, LLC v. Att'y Gen.*, 34 F.4th 1196, 1209 (11th Cir. 2022). "A substantial likelihood of success on the merits requires

a showing of only *likely* or probable, rather than *certain*, success." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1232 (11th Cir. 2005) (emphases in the original).

The First Amendment to the United States Constitution provides that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people peaceably to assemble, and to petition the government for redress of grievances." U.S. Const. amend. I. The Fourteenth Amendment's due process clause extends these prohibitions against the States. *Stromberg v. California*, 283 U.S. 359, 368 (1931).

### i.    Standing

Defendants argue that Plaintiffs lack Article III standing to bring their facial and overbreadth challenges to the Lobbying Restrictions. ECF No. [35] at 10. First, they argue that Plaintiffs have failed to show an "injury in fact – an invasion of a legally protected interest that is both (1) concrete and particularized and (2) actual or imminent, not conjectural or hypothetical." *Id.* (quoting *Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198, 1201 (11th Cir. 2021). Second, Defendants argue that Plaintiffs' overbreadth challenge fails because they have failed "to adduce evidence about how third parties will be affected differently than them." ECF No. [35] at 11. Third, Defendants assert that, even if Plaintiffs have standing to challenge some aspect of the Lobbying Restrictions, "they only have standing to dispute specific provision(s) of the Challenged Laws that injured them." ECF No. [35] at 11 (citing *CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1273 (11th Cir. 2006)).

In the First Amendment context, courts apply "the injury-in-fact requirement most loosely where First Amendment rights are involved, lest free speech be chilled even before the law or regulation is enforced." *Harrell v. The Florida Bar*, 608 F.3d 1241, 1254 (11th Cir. 2010). "Thus, it is well-established that an actual injury can exist when the plaintiff is chilled from exercising

her right to free expression or forgoes expression in order to avoid enforcement consequences. In such an instance, the injury is self-censorship." *Id*. (cleaned up).

The overbreadth doctrine allows plaintiffs "to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973). "A plaintiff who has established constitutional injury under a provision of a statute as applied to his set of facts may also bring a facial challenge, under the overbreadth doctrine, to vindicate the rights of others not before the court under that provision." *CAMP Legal Def. Fund*, 451 F.3d at 1271. To succeed on a First Amendment overbreadth challenge, the plaintiff must show that a "substantial number of [the statute]'s applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (internal quotation marks omitted).

As the Eleventh Circuit explained in detail in *CAMP Legal Defense Fund*, "injury under one provision" of a statute is not "sufficient to confer standing on a plaintiff to challenge all provisions of the [statute]." 451 F.3d at 1273. Accordingly, even in a First Amendment overbreadth challenge, a plaintiff must "establish injury in fact as to each provision" that is challenged in the lawsuit. *Id.* at 1273. To do so, a plaintiff must sufficiently allege that he "'has sustained or is immediately in danger of sustaining a direct injury as the result of'" each provision[.]" *Id*. at 1274 (quoting *Laird v. Tatum*, 408 U.S. 1, 13 (1972)).

Here, as noted above, the Lobbying Restrictions consist of two provisions within Article 2, Section 8(f) of the Florida Constitution: Section 8(f)(2) (the "In-Office Restrictions") and Section 8(f)(3) (the "Post-Office Restrictions"). The Court agrees with Defendants that standing

to challenge one set of Lobbying Restrictions does not necessarily confer standing to challenge the other. For example, as discussed below, a currently-serving public officer may have standing to challenge the In-Office Restrictions yet fails to establish standing to challenge the Post-Office restrictions. Conversely, a former public officer (who left office on or after December 31, 2022) may have standing to challenge the Post-Office Restrictions but not the In-Office Restrictions.

Thus, the Court analyzes whether each of the named Plaintiffs has established standing to challenge each provision of the Lobbying Restrictions.

### 1. René Garcia

Plaintiff René Garcia is the "Executive Vice President of New Century Partnership, LLC, a business consulting firm . . . whose services include lobbying[.]" ECF No. [19-3] ¶ 4. He asserts that the Lobbying Restrictions will "improperly limit [his] ability to advocate before any government agencies due to the fact that [he is] currently serving as a Miami-Dade County Commissioner." *Id*. ¶ 5. Those allegations establish that Garcia reasonably fears the Lobbying Restrictions will be enforced to limit his First Amendment rights. *See Harrell*, 608 F.3d at 1254. He therefore has standing to challenge the In-Office Restrictions.

However, Garcia has not alleged in the Complaint or his affidavit, attached to the Plaintiffs' Motion, that he ever intends to leave public office, or that he intends to continue his lobbying practice when he does so. Because Garcia did not allege that the Post-Office Restrictions have caused or will cause him injury, he has failed to establish standing to challenge the Post-Office Restrictions.

### 2. Javier Fernández

Plaintiff Javier Fernández is Mayor of the City of South Miami and an attorney in private practice. ECF No. [42-1] ¶¶ 2, 4. He asserts that, due to his fear of enforcement of the Lobbying

Restrictions, he was forced to decline representation of a "longtime client to help negotiate a procurement matter on its behalf with another municipality." *Id*. ¶ 7. He describes other matters of representation that he declined for fear of running afoul of the Lobbying Restrictions. *Id*. ¶ 8. He has sufficiently alleged that his reasonable fear of enforcement of the In-Office Lobbying Restrictions is impairing his "ability to advocate" for his clients and chilling his First Amendment rights. *Id*. ¶ 10; *see Harrell*, 608 F.3d at 1254. Those allegations suffice to establish standing to challenge the In-Office Restrictions.

Like Garcia, however, Fernández has not alleged that he will ever leave public office or that he will be affected by the Post-Office Restrictions if and when he does so. *See* ECF Nos. [1], [19-4] (Declaration of Javier Fernández), [42-1] (Supplemental Declaration of Javier Fernández). As such, he has not established standing to challenge the Post-Office Restrictions.

### 3.   Mack Bernard

Plaintiff Mack Bernard is an attorney who has been a Palm Beach County Commissioner since 2016. ECF Nos. [1] ¶ 12; [19-6] ¶¶ 2, 4. He asserts that he "advise[s] clients on a variety of matters, including tax and real estate," and he fears the Lobbying Restrictions will inhibit his legal practice. ECF No. [19-6] ¶ 4.

However, Bernard has not alleged that he currently does any work that might fall within the Statute's definition of "Lobby" or "Lobby for compensation," which explicitly exempts "[r]epresentation of a person on a legal claim cognizable in a court of law, in an administrative proceeding, or in front of an adjudicatory body, including representation during prelitigation offers, demands, and negotiation[.]" Fla. Stat. § 112.3121(12)(b)(4). Plaintiffs are correct that the injury-in-fact requirement is applied "most loosely where First Amendment rights are involved," but a plaintiff must still establish "that he seriously wishes to engage in expression that is *at least*

*arguably forbidden* by the pertinent law[.]" *Harrell*, 608 F.3d at 1254, 1260 (quotation marks omitted) (emphasis in the original). Put differently, the plaintiff's concern that his speech will be chilled must be objectively reasonable. *ACLU v. The Florida Bar*, 999 F.2d 1486, 1494 & n.13 (11th Cir. 1993). Bernard has failed to show that his legal practice, which allegedly consists of advice to "clients on a variety of matters, including tax and real estate," will in any way be affected by the In-Office Restrictions. ECF No. [19-6] ¶ 4.

Regarding the Post-Office Restrictions, Bernard alleges that he "intends to advocate before Palm Beach County and its agencies commencing two years after the conclusion of his public service, and more immediately with respect to other lobbying activities." ECF No. [1] ¶ 12. The fact that he has been serving since 2016 suggests that he is a long-term public officer with no *imminent* intention of engaging in post-service "lobbying activities." *Id.* "Such 'some day' intentions – without any description of concrete plans, or indeed even any specification of *when* the some day will be – do not support a finding of the 'actual or imminent' injury that our cases require." *Lujan v. Defenders of Wildlife*, 504 U.S. 55, 564 (1992). Accordingly, the Court concludes that Bernard has failed to establish standing to challenge the Lobbying Restrictions.

### 4.  William Proctor

Plaintiff William Proctor has served as a Leon County Commissioner since 1996, and he "intends to advocate before Leon County and its agencies starting two years after the conclusion of his public service, and more immediately with respect to other lobbying activities." ECF No. [1] ¶ 13. Proctor has not filed an affidavit in support of Plaintiffs' Motion for Preliminary Injunction.

Proctor's allegations are insufficient to establish standing in this case. He has not alleged that he intends to engage in lobbying while serving as a County Commissioner, so he lacks

standing to challenge the In-Office Restrictions. As for the Post-Office Restrictions, Proctor has given no indication as to when his public service will conclude. *See* ECF No. [1] ¶ 13. Like Bernard, he appears to be a long-serving public officer with no *imminent* intention of engaging in post-service "lobbying activities." ECF No. [1] ¶ 13. Proctor's "'some day' intentions – without any description of concrete plans, or indeed even any specification of *when* the some day will be – do not support a finding of the 'actual or imminent' injury[.]" *Lujan*, 504 U.S. at 564.

### 5. The Lobbying Restrictions' Effect on Non-Parties

 "It is inappropriate to entertain a facial overbreadth challenge when the plaintiff fails to adduce any evidence that third parties will be affected in any manner differently from herself." *Josephine Havlak Photographer, Inc. v. Vill. of Twin Oaks*, 864 F.3d 905, 912 (8th Cir. 2017); *see also Ashcroft v. Am. Civil Liberties Union*, 535 U.S. 564, 584-585 & 585 n.16 (2002) (indicating that, to properly bring a facial challenge, a plaintiff must bring evidence and not mere speculation that a law prohibits a substantial amount of protected speech).

In their Reply, Plaintiffs have included a resignation letter from Lubby Navarro, a former Miami-Dade School Board Member, who, like former Plaintiff Crystal Wagar, resigned prior to December 31, 2022, to avoid violating the Lobbying Restrictions. *See* ECF No. [42-2]. They have also included a declaration from Steven Geller, an attorney, registered lobbyist, and Broward County Commissioner, who alleges that the Lobbying Restrictions are affecting his law practice. *See generally* ECF No. [42-3].

The Court concludes that an overbreadth challenge is appropriate in these circumstances. Plaintiffs have plausibly alleged – and supported with affidavits – that the In-Office Restrictions "substantially abridge[ ] the First Amendment rights of parties not before the court[.]" *CAMP Legal Defense Fund*, 451 F.3d at 1273 (quotation marks omitted). Such parties include individuals

like Crystal Wagar and Lubby Navarro, who vacated public office rather than forego their First Amendment rights, and individuals like Plaintiff Garcia, Plaintiff Fernández, and non-party Steven Geller, who reasonably fear that the Lobbying Restrictions are having a chilling effect on their First Amendment rights.

In sum, the Court concludes that René Garcia and Javier Fernández have established Article III standing to bring facial and as-applied challenges to the In-Office Restrictions. However, no Plaintiff has established standing to challenge the Post-Office Restrictions. Accordingly, the Court addresses the In-Office Restrictions.

### ii. Level of Scrutiny

The parties dispute the appropriate level of scrutiny the Court must apply to the In-Office Restrictions. While the parties agree that "lobbyists are protected by the First Amendment right to petition," *Autor v. Pritzker*, 740 F.3d 176, 182 (D.C. Cir. 2014), they disagree as to *how much* protection the First Amendment affords to public officers who seek to engage in compensated lobbying. Plaintiffs argue that strict scrutiny applies because the Lobbying Restrictions are content-based restrictions on "core political speech." ECF No. [19] at 14 (quoting *Weaver v. Bonner*, 309 F.3d 1312, 1319 (11th Cir. 2002)). Defendants urge the Court to instead apply various forms of intermediate scrutiny. *See generally* ECF No. [35].

As an initial matter, it is necessary to clarify *whose* First Amendment rights are the subject of this litigation. There are two groups of entities whose rights are potentially curtailed by the In-Office Restrictions: public officers who seek to receive compensation for lobbying, and those who seek to hire public officers as lobbyists. Regarding the latter group, the Supreme Court has left no doubt that the right of an association to lobby "to enact favorable legislation" is "fully protected by the First Amendment." *F.T.C. v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 426 (1990);

*Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984) ("[I]mplicit in the right to engage in activities protected by the First Amendment [is] a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends."). By restricting whom an individual or organization can hire as lobbyists, the Lobbying Restrictions infringe upon those entities' rights. *Meyer v. Grant*, 486 U.S. 414, 424 (1988). Accordingly, in evaluating a law that prohibited an advocacy organization from hiring former legislators to lobby on the organization's behalf, one district court applied strict scrutiny. *Brinkman v. Budish*, 692 F. Supp. 2d 855, 861 (S.D. Ohio, 2010).

In this case, however, there is no plaintiff asserting an infringement of its right to hire lobbyists. Rather, each Plaintiff with standing is a currently-serving public officer who seeks to engage in compensated lobbying. In a sense, the Lobbying Restrictions do not infringe upon Plaintiffs' "right to speak and petition," but rather their "desire to receive compensation for doing so." *Miller v. Ziegler*, 582 F. Supp. 3d 640, 645 (W.D. Mo. 2022). However, the Supreme Court has held that individuals do not forfeit their First Amendment rights by receiving compensation. *See, e.g.*, *United States v. National Treasury Employees Union*, 513 U.S. 454, 468 (1995). Nor do they forfeit those rights altogether by accepting government employment. *See, e.g.*, *Snepp v. United States*, 444 U.S. 507, 509 n.3 (1980).

As Defendants correctly note, "speech which is ordinarily entitled to First Amendment protection may be subject to different rules when the speech is restricted solely on grounds that the speaker is a public employee." ECF No. [35] at 11 (quoting *Sector Enterprises, Inc. v. DiPalermo*, 779 F. Supp. 236, 241 (N.D.N.Y. 1991)). That is because "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Pickering v. Bd.*

*of Educ.*, 391 U.S. 563, 568 (1968). Courts apply what has become known as the "*Pickering* test" to "arrive at a balance between the employee's interest in commenting on matters of public concern and his employer's interest in efficiently providing public services." *Moss v. City of Pembroke Pines*, 782 F.3d 613, 621 (11th Cir. 2015).

But the *Pickering* line of cases typically "involve a *post* hoc analysis of one employee's speech and its impact on that employee's public responsibilities." *National Treasury Employees Union* (*NTEU*), 513 U.S. at 466-67. *Pickering* is inapplicable when evaluating laws that function as a "wholesale deterrent to a broad category of expression by a massive number of potential speakers." *Id*. at 467. "The widespread impact" of such laws "give rise to far more serious concerns than could any single supervisory decision." *Id*. at 468. Evaluating those laws is accomplished under a heightened version of the *Pickering* test. *Id*.

The Supreme Court set forth that heightened standard in *NTEU*. There, the Court considered the constitutionality of a law that prohibited "nearly all employees of the Federal Government" from accepting honoraria for appearances, speeches, or articles. 513 U.S. at 459. This prohibition applied even when the employees' speech occurred "outside the workplace" and involved content unrelated to their government employment. *Id.* at 466. Because the honoraria ban "unquestionably imposes a significant burden on expressive activity" and "chills potential speech before it happens," the Court held that the government "must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's "'necessary impact on the actual operation' of the Government." *Id.* (quoting *Pickering*, 391 U.S. at 571).

The *NTEU* test requires the State to "demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way."

*NTEU*, 513 U.S. at 475; *see also City of San Diego v. Roe*, 543 U.S. 77, 80 (2004) ("[W]hen government employees speak or write on their own time on topics unrelated to their employment, the speech can have First Amendment protection, absent some governmental justification 'far stronger than mere speculation' in regulating it."). As the Eleventh Circuit has recognized, the *NTEU* test "places a heavy burden on the government[.]" *O'Laughlin v. Palm Beach Cnty.*, 30 F.4th 1045, 1054 (11th Cir. 2022).

The Court finds the In-Office Restrictions analogous to the honoraria ban in *NTEU*. Both prohibit government employees from receiving compensation for their expressive activity. Like the honoraria ban at issue in *NTEU*, the Lobbying Restrictions "induce[ ] [government employees] to curtail their expression if they wish to continue working for the Government." *NTEU*, 513 U.S. at 469. Such a "prohibition on compensation unquestionably imposes a significant burden on expressive activity." *Id.* Thus, if the Lobbying Restrictions were a content-neutral prohibition on all compensated lobbying by current public officials, the Court would apply the *NTEU* test.

Crucially, however, the Lobbying Restrictions are not content neutral. As Plaintiffs correctly point out, ECF No. [42] at 9, the Lobbying Restrictions prohibit lobbying only "on issues of policy, appropriations, or procurement." Fla. Const. Art. II § 8(f)(2). By limiting the Lobbying Restrictions to those three issues, the Lobbying Restrictions "regulate[ ] certain subject matters

but not others."[3] *Otto v. City of Boca Raton*, 981 F.3d 854, 862 (11th Cir. 2020). They "are plainly speaker-focused and content-based restrictions on speech: they limit a category of people – [lobbyists] – from communicating a particular message." *Id*. at 863. Thus, because the Lobbying Restrictions are not content neutral, the *NTEU* test cannot apply. *See NTEU*, 513 U.S. at 468 (noting that the honoraria ban does not discriminate "among speakers based on the content or viewpoint of their messages").

The Lobbying Restrictions' targeting of specific issues dooms Defendants' time-place-manner argument. ECF No. [35] at 12-13 (citing *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1471 (2022). In *City of Austin*, the Court held that strict scrutiny was not triggered by a city's sign code provisions that prohibited "signs that advertise things that are not located on the same premises as the sign[.]" 142 S. Ct. at 1468. Although enforcement of the provisions required "reading a billboard to determine whether it directs readers to the property on which it stands," the Court reasoned that the sign's "substantive message itself" was irrelevant. *Id.* at 1472. The provisions contained "no content-discriminatory classifications for political messages, ideological messages," or others, so strict scrutiny was not warranted. *Id*. Applying *City of Austin's* logic, it could be argued that examining a public officer's speech does not necessarily render the Lobbying Restrictions content-based, if the sole purpose of examining his speech is to

---

[3]It is unclear what types of lobbying would pertain to an issue *other* than "policy, appropriations, or procurement." The Implementing Statute's definition of "Issue of policy" provides that the term "does not include a decision or determination of any rights, duties, or obligations made on a case-by-case basis." Fla. Stat. § 112.3121(8). Arguably, the Lobbying Restrictions' limitation to the three issues of "policy, appropriations, or procurement" is meant to prevent the Lobbying Restrictions from applying to an attorney's legal representation of a single client, which is expressly excluded from the definition of "lobby for compensation." *Id.* at 112.3121(12)(b)(4). According to that interpretation, the Lobbying Restrictions specify issues of "policy, appropriations, or procurement" to help define the meaning of "lobbying," not to discriminate among subjects. However, that interpretation raises redundancy and superfluity issues, *see Mackey v. Lanier Coll'n Agency & Serv., Inc.*, 486 U.S. 825, 826 (1988), and, in any event, is not presently being advanced by Defendants.

determine whether he is engaging in lobbying. *See* Fla. Stat. § 112.3121(11)(a) (defining lobby as "to influence or attempt to influence an action or decision through oral, written, or electronic communication"). But *City of Austin* provides no support for the proposition that a statute that "single[s] out [a] topic or subject matter for differential treatment" can be anything other than content-based. *See* 142 S. Ct. at 1472. That is precisely what the Lobbying Restrictions do: They "single out" three issues "for differential treatment": issues of policy, appropriations, and procurement. Fla. Const. Art. II § 8(f)(2).

As such, the Court concludes that the Lobbying Restrictions are content-based regulations of speech and, therefore, they "must satisfy strict scrutiny." *Otto*, 981 F.3d at 868. "Under strict scrutiny, content-based restrictions are presumptively unconstitutional." *Id.* (quotation marks omitted). They can be justified "only if the government proves that they are narrowly tailored to serve compelling state interests." *Id.*

### iii.   The Compelling State Interest

The Court begins the strict scrutiny analysis by evaluating the State's purported compelling interests in regulating compensated lobbying of public officers. While Defendants have asserted two state interests, they rely solely on the prevention of *quid pro quo* corruption and its appearance when arguing that the Lobbying Restrictions survive strict scrutiny.[4] Plaintiffs agree, as they must, that the prevention of *quid pro quo* corruption and its appearance is a compelling government interest. ECF No. [42] at 4; *see McCutcheon v. Fed. Election Com'n*, 572 U.S. 185, 192 (2014)

---

[4] Defendants argue elsewhere in their brief that Florida has an interest in "fostering socially efficient legislation." ECF No. [35] at 17. As Plaintiffs point out, Defendants' "socially efficient legislation" argument relies entirely on a single law review article arguing that courts should consider "promotion of national economic welfare as a sufficiently important, even compelling, government interest so as to justify many of the new lobbying regulations." Richard L. Hasen, *Lobbying, Rent-Seeking, and the Constitution*, 64 Stan. L. Rev. 191, 198 (2012). Due to this argument's lack of development and its absence from the relevant section of Defendants' brief, the Court will not consider it further.

(recognizing that the prevention of *quid pro quo* corruption or its appearance is a compelling government interest). Thus, the Court will consider whether the In-Office Restrictions are narrowly tailored to further that interest.

### iv.   Narrowly Tailored

"Because the Government is defending a restriction on speech as necessary to prevent an anticipated harm, it must do more than simply posit the existence of the disease sought to be cured." *Fed. Election Comm'n v. Cruz*, 142 S. Ct. 1638, 1653 (2022) (quotation marks omitted). "It must instead point to record evidence or legislative findings demonstrating the need to address a special problem." *Id*. (quotation marks omitted). "The quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised." *Nixon v. Shrink Mo. Gov. PAC*, 528 U.S. 377, 391 (2000).

At the Hearing, Defendants argued that the Court may look to the history of lobbying regulations as evidence that such laws are necessary to address the evil of *quid pro quo* corruption. Defendants directed the Court to *Burson v. Freeman*, 504 U.S. 191, 200 (1992), wherein the Supreme Court engaged in a historical analysis of election reform to conclude that compelling government interests were served by limiting access to the areas in or around polling places. The *Burson* Court found it notable that "all 50 states" have such restrictions, and it concluded that the "widespread and time-tested consensus demonstrates that some restricted zone is necessary in order to serve the States' compelling interests in preventing voter intimidation and election fraud." *Id*. at 206; *see also Republican Party of Minn. v. White*, 536 U.S. 765, 785 (2002) ("[A] universal and long-established tradition of prohibiting certain conduct creates a strong presumption that the prohibition is constitutional." (quotation marks omitted)). In light of this authority, the Court

agrees with Defendants that a demonstrated history of lobbying restrictions would constitute evidence that such laws are effective in addressing the problem of corruption.

Here, however, scant historical evidence has been provided. Defendants assert that "Florida's ambition to shut the 'revolving door' between public office and private lobbying is neither new, nor unexplored by many other states across the nation." ECF No. [35] at 2. Defendants direct the Court to a study indicating that all but six states have laws prohibiting public officials from engaging in lobbying activities for a period of time after leaving service. *See* National Conference of State Legislators, Revolving Door Prohibitions, *available at* https://www.ncsl.org/ ethics/revolving-door-prohibitions.

Defendants additionally direct the Court to hearings before Florida's Constitutional Revision Commission, which crafted the Amendment. *See* Constitutional Revision Commission (CRC), Transcripts: Full Transcripts of CRC Meetings, *available at* http://library.law.fsu.edu/ Digital-Collections/CRC/CRC-2018/Meetings/Transcripts.html. Having reviewed those transcripts, the Court has found minimal empirical evidence or legislative findings that the Lobbying Restrictions are necessary or adequate to address *quid pro quo* corruption. At best, the Court has found references to a "statewide Grand Jury [that] found that the revolving door between holding office and lobbying undermines the integrity of local government." *See* CRC Session Transcript, March 19, 2018, vol. II at 240:8-11; *see also id.*, April 16, 2018, vol. II at 276:23-25 ("Ending this practice of monetizing public service for private gain is what two statewide Grand Juries have called for[.]"). The Court has also found anecdotes about "elected State Representatives who have used their position to garner business, to get votes at local entities, et cetera." *Id.*, April 16, 2028, vol. III at 327:14-20; *see also id.*, March 19, 2018, vol. II at 247:20-25 (discussing an example of "an individual [who] served on the County Commission and the day,

literally the day after he left office, he became a lobbyist for the company that had the garbage contract."). There are also multiple statements from commissioners reflecting a belief that the Lobbying Restrictions will reduce corruption. *See id.*, April 16, 2018, vol. III at 327:25-328:1-5 (stating that the Amendment "prevents that person who thinks . . . they're going to be able to use [public office] to gain an advantage for themselves or their business or their family"); *see also id.*, March 19, 2018, vol. II at 285:21-24 (discussing voters' "talk about their perception, about corruption, and about how the process has just been turned on its head by money.").

Regarding the mechanism by which the In-Office Restrictions prevent *quid pro quo* corruption or its appearance, Defendants argue that "[a]llowing a currently serving public officer to receive compensation for lobbying for the very interests he is tasked with governing invites quid pro quo corruption." ECF No. [35] at 13-14. That argument is logical. A commissioner who is paid to lobby the very commission he sits on may indeed appear to be engaging in *quid pro quo* corruption: "dollars for political favors." *McCutcheon*, 572 U.S. at 192 (quotation marks omitted). Therefore, as Defendants correctly note, the Lobbying Restrictions' limitation to compensated lobbying is one way that the Lobbying Restrictions are tailored to address the situation wherein *quid pro quo* corruption is more likely to arise – when a public officer receives money while ostensibly serving the public. *See Brinkman*, 692 F. Supp. 2d at 864 (finding that compelling interests were served by a prohibition on compensated lobbying but not uncompensated lobbying); *see also Miller*, 582 F. Supp. 3d at 646 ("[T]he public interest is different and greater when the lobbying activity is paid.").

However, the In-Office Restrictions are problematic in at least two ways. First, Defendants have provided no explanation as to why the In-Office Restrictions are limited to lobbying on "issues of policy, appropriations, or procurement." Fla. Const. Art. II § 8(f)(2). As discussed

above, it is this issue-based discrimination that renders the In-Office Restrictions presumptively unconstitutional. As such, Defendants must show that compensated lobbying on those three issues – but not others – is particularly likely to lead to *quid pro quo* corruption. Defendants have made no such showing, and it appears unlikely that they will succeed in doing so. Despite being extremely broad, the In-Office Restrictions are also underinclusive in that they would apparently allow a commissioner to receive compensation in exchange for lobbying the very committee he sits on, as long as he does not discuss one of the three prohibited issues. *See Williams-Yulee v. Florida Bar*, 575 U.S. 433, 449 (2015) ("Underinclusiveness can . . . reveal that a law does not actually advance a compelling interest.")); *Reed v. Town of Gilbert*, 576 U.S. 155, 172 (2015) ("[A] law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction on truthful speech, when it leaves appreciable damage to that supposedly vital interest unprohibited[.]" (quotation marks omitted));

Second, unlike the Post-Office Restrictions, the scope of the In-Office Restrictions does not depend on the public officer's position. Every public officer is subject to the same categorical ban on lobbying "before the federal government, the legislature, any state government body or agency, or any political subdivision of this state," regardless of whether the public officer is a "statewide elected officer," a "county commissioner" like Plaintiff René Garcia, or "a school board member" like Lubby Navarro. Fla. Const. Art. 2 § 8(f)(1-2). Prohibiting Garcia from receiving money to lobby the very committee he sits on would arguably further the State's interests of preventing *quid pro quo* corruption or its appearance. However, Defendants have not shown a link between *quid pro quo* corruption and prohibitions against Garcia lobbying other state entities. *See Otto*, 981 F.3d at 868 (noting that "[t]he Government carries the burden of proof" to show that the challenged law is narrowly tailored to further a compelling interest). Similarly, Defendants have

shown no nexus between *quid quo pro* corruption and Garcia's lobbying of the federal government. *Id.*; *see also* CRC Session Transcript, April 16, 2018, vol. III at 320:18-20 (Commissioner Diaz asking: "Can the State really tell somebody that . . . they cannot lobby the federal government?"). Accordingly, the In-Office Restrictions appear to "reach[ ] more broadly than is reasonably necessary to protect legitimate (governmental) interests[.]" *Grand Faloon Tavern, Inc. v. Wicker*, 670 F.2d 943, 946 (11th Cir. 1982) (quotation marks omitted).

The Court concludes that the challenged In-Office Restrictions are unlikely to survive because they are overbroad, underinclusive, and they inexplicably "single out" the three issues of policy, appropriations, and procurement, and appropriations "for differential treatment." *City of Austin*, 142 S. Ct. at 1472. As content-based restrictions of speech, the In-Office Restrictions "are presumptively unconstitutional," *Otto*, 981 F.3d at 868, and for the reasons explained above, Defendants are unlikely to rebut that presumption. Accordingly, Plaintiffs are likely to succeed on the merits of their challenge to the In-Office Restrictions.

### B.  The Remaining Preliminary Injunction Factors

Within the context of a First Amendment overbreadth challenge, the Court's foregoing conclusion on the merits renders unnecessary an in-depth discussion of the remaining three preliminary injunction factors. *See, e.g.*, *Otto*, 981 F.3d at 870. The second requirement – "irreparable injury" – is met because enforcement of an unconstitutional restriction on protected speech "for even minimal periods of time, constitutes a per se irreparable injury." *Id.* (quotation marks omitted); *see also Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990) ("The only area of constitutional jurisprudence where we have said that an on-going violation constitutes irreparable injury is the area of first amendment and right of privacy jurisprudence.").

The third and fourth preliminary injunction factors – "damage to the opposing party" and "public interest" – are also satisfied because the In-Office Restrictions are likely unconstitutional. "It is clear that neither the government nor the public has any legitimate interest in enforcing an unconstitutional [law]." *Otto*, 981 F.3d at 870.

Accordingly, the Court concludes that all four factors favor the granting of a preliminary injunction.

### C.  Scope of the Injunction

The remaining issue is the appropriate scope of the preliminary injunction. Defendants argue that any preliminary injunction should be limited to "enjoining enforcement of the in-office restrictions against the Plaintiffs, not every public officer (or other types of public officers) in the state – and not enforcement of the post-office restrictions at all." ECF No. [35] at 19. The Court agrees that the preliminary injunction should not extend to the Post-Office Restrictions, since none of the Plaintiffs have established standing to challenge those Restrictions.[5]

However, because the Court has concluded the In-Office Restrictions are likely overbroad and facially unconstitutional, it would be inappropriate to limit relief to the named Plaintiffs in this case. "[A] statute found to be overbroad is 'totally forbidden until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression.'" *FF Cosmetics FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1300 (11th Cir. 2017) (quoting *Broadrick*, 413 U.S. at 613). No reasonable limiting construction is apparent in this case. The appropriate remedy, therefore, is to enjoin enforcement of the In-Office Restrictions altogether.

---

[5] Even if Plaintiffs did have standing to challenge the Post-Office Restrictions, they would be unable to show irreparable harm, because no Plaintiff has alleged that they intend to engage in post-office lobbying before this case is scheduled to conclude.

## IV.     CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1.  Plaintiffs' Renewed Motion for Preliminary Injunctive Relief, **ECF No. [19]**, is **GRANTED IN PART AND DENIED IN PART**.

2.  Defendants, together with their officers, agents, servants, employees, and attorneys, as well as all other persons who are in active concert or participation with any of the foregoing individuals, are **ENJOINED** from enforcing Article II, Section 8(f)(2) of the Florida Constitution.

3.  This Preliminary Injunction shall remain in effect during the pendency of this case and until further Order of the Court.

**DONE AND ORDERED** in Chambers at Miami, Florida, on February 28, 2023.

_____

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record