# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

RENÉ GARCIA, *et al.,*

        Plaintiffs,

        v.

KERRIE J. STILLMAN, *et al.*,

        Defendants.

Case No. 22-cv-24156

<br>

## [PROPOSED] AMICUS CURIAE BRIEF OF CAMPAIGN LEGAL CENTER IN SUPPORT OF DEFENDANTS

Simone Leeper
(Fla. Bar No. 1020511)
CAMPAIGN LEGAL CENTER
1101 14th Street NW, Suite 400
Washington, D.C. 20005
Telephone: (202) 736-2200

*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Campaign Legal Center is a nonprofit organization organized under Section 501(c)(3) of the Internal Revenue Code. Campaign Legal Center neither has a parent corporation nor issues stock. There are no publicly held corporations that own ten percent or more of the stock of Campaign Legal Center.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................................................. i

TABLE OF AUTHORITIES ................................................................................................... iii

STATEMENT OF INTEREST OF AMICUS CURIAE ........................................................1

SUMMARY OF ARGUMENT ................................................................................................1

ARGUMENT ..........................................................................................................................3

    I.   Plaintiffs' Challenge to the In-Office Lobbying Restriction Does Not Warrant the
Application of Strict Scrutiny. ...........................................................................................3

        A.  Far broader lobbying regulations are held to only intermediate scrutiny. ....................3

        B.  Restricting a public officeholder's ability to engage in paid lobbying does not
significantly burden any cognizable First Amendment right to speak, petition, or
associate......................................................................................................................4

    II.  In-Office Lobbying Restrictions Are Well-Established Nationwide as Measures that
Prevent Corruption and its Appearance .............................................................................7

        A.  Preventing the actuality and appearance of quid pro quo corruption is a
compelling government interest. ..................................................................................8

        B.  Jurisdictions nationwide have recognized that paid lobbying by public
officeholders poses unique corruption concerns and—like Florida—have taken
steps to restrict it .....................................................................................................10

CONCLUSION.....................................................................................................................14

# TABLE OF AUTHORITIES

**Cases:**                                                                                                    **Page:**

*Brinkman v. Budish*, 692 F. Supp. 2d 855 (S.D. Ohio 2010)...........................................................9

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973) .........................................................................7

*Buckley v. Valeo*, 424 U.S. 1 (1976) ...................................................................................2, 8

*Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009) ...........................................................9

*Citizens United v. FEC*, 558 U.S. 310 (2010)...........................................................................9

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464 (2022)............................4

*Clements v. Fashing*, 457 U.S. 957 (1982) ...............................................................................7

*Florida Ass'n of Pro. Lobbyists, Inc. v. Div. of Legis. Info. Servs. of the Fla. Off. of Legis. Servs.*, 525 F.3d 1073 (11th Cir. 2008)................................................................................4, 7

*Florida League of Pro. Lobbyists, Inc. v. Meggs*, 87 F.3d 457 (11th Cir. 1996) ...........................4

*Garcetti v. Ceballos*, 547 U.S. 410 (2006) ...............................................................................5

*McConnell v. FEC*, 540 U.S. 93 (2003)...............................................................................1, 8

*McCutcheon v. FEC*, 572 U.S. 185 (2014) ............................................................................2, 8

*Miller v. Ziegler*, 582 F. Supp. 3d 640 (W.D. Mo. 2022) .......................................................5, 6

*Miller v. Ziegler*, No. 2:21-cv-4233-MDH, 2023 WL 2719472 (W.D. Mo. Mar. 30, 2023) ...............................................................................2, 5, 6, 7, 9, 10

*North Carolina Right to Life, Inc. v. Bartlett*, 168 F.3d 705 (4th Cir. 1999) ................................6

*Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377 (2000) ........................................................8

*Pickering v. Board of Education*, 391 U.S. 563 (1968).............................................................3, 5

*Preston v. Leake*, 660 F.3d 726 (4th Cir. 2011) ....................................................................6, 8

*Schickel v. Dilger*, 925 F.3d 858 (6th Cir. 2019)..............................................................4, 6, 8, 9

*United States v. Harriss*, 347 U.S. 612 (1954) .........................................................................4

*United States v. Nat'l Treasury Employees Union*, 513 U.S. 454 (1995) ...................................5, 7

*U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 413 U.S. 548 (1973)......2, 7

*Wagner v. FEC*, 793 F.3d 1 (D.C. Cir. 2015)...........................................................................8

*Williams-Yulee v. Florida Bar*, 575 U.S. 433 (2015) ............................................................8, 9

**Statutes, Rules, and Constitutional Provisions:**

2 U.S.C. § 1602.......................................................................................................................3

Ala. Code § 36-25-23(a) .........................................................................................................10

Ark. Code Ann. § 21-8-103(a).................................................................................................10

Conn. Gen. Stat. §1-91(12) .................................................................................................11

Conn. Gen. Stat. § 2-16a ....................................................................................................10

D.C. Code Ann. § 1-1162.31(f) ..........................................................................................10

Fla. Const. Art. II, § 8 ..........................................................................................................1

Fla. Stat. § 112.3121 .............................................................................................................1

Fla. Stat. § 112.3122 .............................................................................................................1

Ga. Stat. § 21-5-76 ..............................................................................................................11

5 Ill. Comp. Stat. 420/2-101 ...............................................................................................12

Ind. Code § 2-7-5-1 .............................................................................................................10

Iowa Code Ann. § 68B.2 .....................................................................................................11

Iowa Code § 68B.5A ...........................................................................................................10

Kan. Stat. Ann. § 46.232 .....................................................................................................10

Ky. Rev. Stat. Ann. §6.811(8) .............................................................................................10

Me. Stat. tit. 1, § 1014 .........................................................................................................10

Minn. Stat. § 3.084 ........................................................................................................10, 11

Miss. Code Ann. § 5-8-13(4) ..............................................................................................10

Mo. Const. art. III § 2(a) ...............................................................................................10, 11

N.C. Gen. Stat. Ann. § 120C-304(a)(1) ........................................................................10, 11

N.C. Gen. Stat. Ann. § 120C-100(19) .................................................................................11

N.H. Rev. Stat. § 21-G:25(I) ...............................................................................................10

N.J. Stat. Ann. § 52:11-71 ...................................................................................................10

Okla. Stat. tit. 74 § 4254 ...............................................................................................10, 11

Or. Rev. Stat. § 171.756 ......................................................................................................11

Or. Rev. Stat. § 171.756(4) ..................................................................................................10

S.C. Code Ann. § 2-17-15 ...................................................................................................10

S.D. Codified Laws § 2-12-8 ...............................................................................................11

Tex. Gov't Code § 556.005 ...........................................................................................10, 13

Wis. Stat. § 13.71 ................................................................................................................11

W. Va. Code § 6B-3-2 ...................................................................................................10, 11

W. Va. Code § 6B-3-1 .........................................................................................................11

**Other Materials:**

Brian Bakst, *Lobbying Law could squeeze some Minnesota legislators*, MPR News (Dec. 16, 2022), https://www.mprnews.org/story/2022/12/16/lobbying-law-could-squeeze-some-minnesota-legislators ...............................................................................................13

Mary Duffy, *Side Effects Raise Flag on Dangers of Ephedra*, N.Y. Times (Oct. 12, 1999), https://www.nytimes.com/1999/10/12/health/side-effects-raise-flag-on-dangers-of-ephedra.html ...............................................................................................................13

Dan Petrella & Jenny Whidden, *A slew of ex-state lawmakers face criminal charges, but critics question whether proposed reforms are enough for Illinois' 'very vibrant culture of corruption'*, Chicago Tribune (May 3, 2021), https://www.chicagotribune.com/politics/ct-illinois-lawmakers-ethics-20210503-6pcaz7bhkfaebcbwasok5tlnme-story.html ..............12

My Plainview, *Lobbying may have violated state law* (Oct. 12, 2002), https://www.my plainview.com/news/article/Lobbying-may-have-violated-state-law-8750772.php ....................13

Press Release, U.S. Attorney's Office, Southern District of Ohio, *Jury convicts former Ohio House Speaker, former chair of Ohio Republican Party of participating in racketeering conspiracy* (Mar. 9, 2023), https://www.justice.gov/usao-sdoh/pr/jury-convicts-former-ohio-house-speaker-former-chair-ohio-republican-party .........................................................13

Staff of H. Comm. on Ethics, 117th Cong., House Ethics Manual (Comm. Print 2022) ..............12

Andrew Tobias, *Corporate jets, bribes and dark money: Householder trial spotlights weaknesses in Ohio ethics laws*, Cleveland Plain Dealer (Jan. 29, 2023), https://www.cleveland.com/news/2023/01/corporate-jets-bribes-and-dark-money-householder-trial-spotlights-weaknesses-in-ohio-ethics-laws.html ........................................................... 13-14

## STATEMENT OF INTEREST OF AMICUS CURIAE

Amicus curiae Campaign Legal Center ("CLC") is a nonpartisan nonprofit organization working for a more transparent, inclusive, and accountable democracy at all levels of government. CLC represents the public perspective in legal proceedings interpreting and enforcing campaign finance, lobbying, ethics, and election laws throughout the nation. *See* https://campaignlegal.org/about.

CLC has a longstanding, demonstrated interest in the constitutionality and efficacy of ethics laws, including those related to lobbying and the "revolving door" between public office and private employment. CLC has participated in numerous cases addressing state and federal ethics, campaign finance, and political disclosure laws, including every major U.S. Supreme Court campaign finance case since *McConnell v. FEC*, 540 U.S. 93 (2003). CLC has also been active in the development of regulations and other administrative guidance interpreting governmental ethics laws at the federal and state level.

No person or entity other than CLC and its counsel made a monetary contribution to this brief's preparation or submission.

## SUMMARY OF ARGUMENT

The right of Florida citizens to honest government is enshrined in the Florida Constitution, which provides that "[a] public office is a public trust. The people shall have the right to secure and sustain that trust against abuse." Fla. Const. Art. II, § 8. On November 6, 2018, an overwhelming 78.9% of Floridians voted to advance this right. They passed a ballot initiative that would amend Article II, Section 8(f) and 8(h)(2) of the State Constitution to restrict current and former officeholders from engaging in lobbying for pay while serving in office or in a brief period thereafter (the "Amendment"). The officeholder plaintiffs—the Mayor of the City of South Miami and a Miami-Dade County Commissioner—now seek to countermand the will of their own constituents by challenging the constitutionality of the Amendment, as well as its implementing statutes. *See* Fla. Stat. §§ 112.3121-112.3122.[1]

Plaintiffs' challenge to the Amendment—specifically, to Article II, § 8(f)(2) of the Florida Constitution, and its implementing statutes (the "In-Office Restrictions")—fails for at least three reasons.

---

[1]   Because the Court has already ruled that the former officeholder-plaintiffs lack Article III standing, this brief addresses only the in-office lobbying restrictions.

First, plaintiffs' theory of constitutional injury is unsupported by any judicial authority, and certainly does not justify application of strict scrutiny here. The Amendment in no way limits officeholders from speaking or petitioning on their own behalf—or even on behalf of others, provided they do so pro bono. The law only limits officeholders' receipt of compensation for lobbying on behalf of third parties. And the First Amendment is usually not "read" to "prohibit[]" a "law that simply prohibits *incentivizing* speech" with payment. *Miller v. Ziegler*, No. 2:21-cv-04233-MDH, 2023 WL 2719472, at *3 (W.D. Mo. Mar. 30, 2023) (emphasis added), *appeal docketed*, No. 23-1902 (8th Cir. May 1, 2023). The only persons who could conceivably allege that the Amendment abridged *their own* speech or petitioning activity are potential lobbying clients, but no such client has joined this case as a party.

Second, plaintiffs conveniently ignore that the Amendment is not a law of general applicability, but rather an ethical standard governing only senior public officials. The U.S. Supreme Court has repeatedly recognized that the state has far greater leeway to regulate public employees to promote governmental efficiency and integrity, even if these regulations entail some First Amendment burden. *See*, *e.g.*, *U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 413 U.S. 548, 567 (1973).

Finally, the Amendment here seeks not merely to promote government efficiency, but also to shield the legislative and executive branches from political corruption and the appearance of corruption. This anti-corruption interest has long been considered "compelling" by the U.S. Supreme Court, *McCutcheon v. FEC*, 572 U.S. 185, 199 (2014), which has recognized that without laws guarding against "political quid pro quo[s] from current and potential office holders, the integrity of our system of representative democracy is undermined," *Buckley v. Valeo*, 424 U.S. 1, 26-27 (1976).

As amicus, CLC will document that the clear risk of corruption and self-dealing arising from lobbying by public officeholders has been recognized not only by Floridians, but also by states across the nation. Almost twenty states have enacted analogous restrictions on in-office lobbying, including some that have similarly limited paid lobbying while a public servant is in office. These state laws and ethics rules are animated by the same concern that motivated the Florida electorate to approve the Amendment: namely, that political corruption and its appearance is inevitable in a system that permits public servants to moonlight as paid lobbyists for deep-pocketed benefactors whose goals may diverge from, or even conflict with, the public interest.

Florida voters' attempt to shield their government from this pernicious and well-recognized threat is not barred by the First Amendment.

Plaintiffs' claims have no merit and summary judgment should be granted in favor of defendants.

## ARGUMENT

I. **Plaintiffs' Challenge to the In-Office Lobbying Restriction Does Not Warrant the Application of Strict Scrutiny.**

Plaintiffs assert that "Florida's prohibition on political advocacy requires strict scrutiny because it collides with the core values of the First Amendment by burdening Plaintiffs' political speech." Compl. ¶ 11. But plaintiffs have not articulated any cognizable First Amendment burden on their own "political speech" or expression—nor could they, because Florida's law neither prevents public officeholders from lobbying on behalf of themselves or others pro bono, nor infringes on any recognized associational right of public officials to associate in the form of paid lobbying. This matter should not trigger any degree of heightened First Amendment review, much less strict scrutiny.

### A. Far broader lobbying regulations are held to only intermediate scrutiny.

As this Court previously recognized, laws regulating the activities of public officeholders and employees, even those implicating the exercise of First Amendment rights, are generally reviewed under the balancing test drawn from *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968), or, at most, under a heightened form of the "*Pickering*" test. *See* Order on Mot. for Prelim. Inj. ("PI Op.") at 13, ECF No. 52 (citing *United States v. Nat'l Treasury Emps. Union (NTEU)*, 513 U.S. 454, 466-67 (1995)). Nevertheless, this Court deviated from the *Pickering*/*NTEU* standard, but not because plaintiffs' asserted First Amendment injury was particularly acute or the law was particularly broad; instead, the Court elevated the standard of review on the theory that the restrictions are "content based" because they define lobbying to cover communications on "policy" and "appropriations." *Id*. at 14-16.

But Florida's law is no more "content based" than other lobbying laws at the federal or state level, such as lobbying disclosure requirements or gift restrictions. *See, e.g.*, 2 U.S.C. § 1602 (defining "lobbying contact" to include communications regarding "the formulation, modification, or adoption of Federal legislation" or "the administration or execution of a Federal program or policy (including the negotiation, award, or administration of a Federal contract, grant, loan,

permit, or license)"). Although such laws are likewise "content based" in a sense—and usually apply far beyond the limited class of public officeholders subject to the Amendment—the level of scrutiny turns on the nature of the actual legal requirement and its impact on the exercise of the First Amendment. Lobbying disclosure laws, for instance, are weighed under an intermediate degree of scrutiny, termed "exacting." *See United States v. Harriss*, 347 U.S. 612, 625-26 (1954); *Fla. League of Pro. Lobbyists, Inc. v. Meggs*, 87 F.3d 457, 460 (11th Cir. 1996) ("It appears, however, that the [*Harriss*] Court did not subject the lobbying restrictions to the demands of strict scrutiny."). Even highly restrictive campaign contribution bans on lobbyists are held to only "closely drawn" scrutiny. *See, e.g.*, *Schickel v. Dilger*, 925 F.3d 858, 869 (6th Cir. 2019) (upholding ban on lobbyist campaign contributions under intermediate "closely drawn" scrutiny); *Preston v. Leake*, 660 F.3d 726, 737 (4th Cir. 2011) (same).

Indeed, it is difficult to conceive of a lobbying-related law that would define the lobbying communications it regulates without some reference to their content, and other courts have not understood this to create a constitutional problem. For instance, the Eleventh Circuit upheld Florida's lobbying disclosure statute without regard to its regulation of attempts "to influence legislative action or nonaction" or "to obtain the goodwill of a member or employee of the Legislature," although the law thus defined covered lobbying activity based on the content of certain communications. *Fla. Ass'n of Pro. Lobbyists, Inc. v. Div. of Legis. Info. Servs. of the Fla. Off. of Legis. Servs.*, 525 F.3d 1073, 1079-80 (11th Cir. 2008) (quoting Fla. Stat. § 11.045(1)(f)). A law draws stringent scrutiny on "content based" grounds if it discriminates against certain viewpoints or subjects, not merely because its application requires some inquiry into "who is the speaker and what is the speaker saying." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1471 (2022). That the Amendment requires a perfunctory look into "what a speaker is saying" to covered governmental actors does not transform the law into invidious content-based speech discrimination.

**B. Restricting a public officeholder's ability to engage in paid lobbying does not significantly burden any cognizable First Amendment right to speak, petition, or associate.**

Compared to other lobbying and ethics laws, the Amendment regulates no more "content" and imposes far fewer burdens on plaintiffs' First Amendment interests—assuming it creates any burdens at all.

First, plaintiffs' personal rights to speak or petition are not implicated at all by the In-Office Restrictions. By claiming that this law unconstitutionally restricts their own political speech to a degree requiring strict scrutiny review, plaintiffs attempt to stretch the protections of the First Amendment beyond their recognized limits.

But none of the plaintiffs asserts a desire to lobby for or on behalf of *themselves*. Instead, they are public officeholders who "anticipate" or hope to engage in paid lobbying activity *on behalf of private clients*. *See* Pls.' Mot. for Summ. J. at 3 (describing their interests as "professional" and "pecuniary"), ECF No. 82; Order on Mot. to Dismiss at 8-11, ECF No. 65. Nothing in the Amendment or its implementing statutes prevents covered officeholders from speaking or lobbying the government: plaintiffs themselves may petition any body of government for redress of grievances. As this Court noted, "the Lobbying Restrictions do not infringe upon Plaintiffs' 'right to speak and petition.'" PI Op. at 12 (quoting *Miller v. Ziegler*, 582 F. Supp. 3d 640, 645 (W.D. Mo. 2022)).

The only restriction in the law is on plaintiffs' receipt of *payment* for lobbying, and it is imposed only as a condition of public office. This Court previously likened Florida's law to the government-wide honorarium ban at issue in *NTEU*, on the ground that "[b]oth prohibit government employees from receiving compensation for *their* expressive activity." *Id.* at 14 (emphasis added). However, *NTEU* and similar cases dealt with laws preventing public employees from receiving compensation for *their own* speech. *See NTEU*, 513 U.S. at 465, 474 (finding honorarium ban violated the First Amendment by imposing "[a] blanket burden on the speech of nearly 1.7 million federal employees" engaged in "expressive activities in their capacity as citizens"); *Pickering*, 391 U.S. at 574 (holding that a teacher who expressed his *own* opinion in letter to a local newspaper engaged in First Amendment-protected speech); *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006) (upholding restriction on speech when employees themselves speak pursuant to their official duties). The law here prevents public officeholders from receiving compensation for transmitting *the speech of others*. Plaintiffs' own speech is not restricted at all.

A federal district court in Missouri recently drew this distinction in its review of a two-year ban on compensated lobbying by state officeholders following their departure from office. It noted that this lobbying ban had no effect on the plaintiff officeholders' "ability to express a particular message, political or otherwise," but rather was "limited to the receipt of payment for lobbying." *Ziegler*, 2023 WL 2719472, at *3. And the "text of the First Amendment," the court concluded,

5

"does not protect the ability to receive *payment* for expression of speech." *Id.* (emphasis added). As the *Ziegler* court also acknowledged, however, the argument "proves different" with respect to a corporate plaintiff that was a potential lobbyist client, who would find it "functionally impossible" to hire a former officeholder to promote its own right to petition. *Id. See also Ziegler*, 582 F. Supp. 3d at 645 (noting that lobbying ban would potentially "burden" only the "entity who wishes to pay a person subject to the lobbying restriction to lobby for it" whereas "[the officeholder's] speech is not directly burdened").

Here, however, no such prospective lobbying client is present, and plaintiff officeholders can speak and petition on their own behalf to their hearts' content. Plaintiffs are limited only in their "receipt of payment for lobbying" on behalf of clients. Any nexus between the Amendment and plaintiffs' right to speech or petition is therefore highly attenuated, if it exists at all.

Second, plaintiffs have also failed to articulate any cognizable burdens on protected associational rights. Covered officeholders remain free to lobby and to associate with clients of their choosing, provided they are not paid to do so. Plaintiffs' asserted associational injury is thus only the right to "associate" in a *compensated* manner—and to do so with unnamed future lobbying clients who appear to be largely hypothetical at this point. Plaintiffs have not identified any case recognizing that the denial of compensation for lobbying constitutes an associational injury.

In fact, a number of federal courts have upheld various lobbying regulations even insofar as they restricted *recognized* associational rights held by lobbyists. *See, e.g.*, *Dilger*, 925 F.3d at 869 (upholding lobbyist contribution ban); *Leake*, 660 F.3d at 737 (same). As the Fourth Circuit concluded, "the State has advanced strong reasons . . . expressly validated" by the Supreme Court for "treat[ing] lobbyists and political committees differently than it does the general population with respect to their fundamental right to associate." *N.C. Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 717 (4th Cir. 1999).

And typically, insofar as other courts have expressed concerns about speech and association in the context of lobbying regulation, it is because laws of general applicability may impose significant costs on lobbying across the board, and thereby limit the representation available to potential clients. As this Court noted, it is the rights of "those who seek to hire" lobbyists that are paramount. PI Op. at 6 (citing *F.T.C. v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 426 (1990)). But Florida's lobbying restrictions have little to no effect on the ability of a would-be client to hire or "associate" with the professional lobbyist of their choice (nor could

any of the plaintiffs here actually claim injury on that theory). To be sure, the law may marginally reduce the potential pool of paid lobbyists in Florida. But it does not prevent a covered officeholder from representing a client pro bono—and, of course, the limited class of senior public officials to whom the law extends is a far cry from, for example, an honorarium ban applied to the "vast rank and file of federal employees." *NTEU*, 513 U.S. at 472. Ultimately, as the *Ziegler* court remarked, this type of lobbying ban does not "in any way prohibit[] [citizens] from hiring a lobbyist *generally*." 2023 WL 2719472, at *3 (emphasis added). "Any burden on [a would-be client], therefore, remains limited." *Id.*

Finally, plaintiffs here are public officeholders. Even if there were some appreciable burden on their associational rights, the Supreme Court has made clear that the First Amendment does not forbid restrictions on the activities and associations of government officials, including state officeholders. *See, e.g.*, *Letter Carriers*, 413 U.S. at 567 (upholding restrictions on the partisan activities of federal employees, as "[n]either the right to associate nor the right to participate in political activities is absolute in any event"); *id.* at 557 (stressing "the judgment of history, a judgment made by this country over the last century that it is in the best interest of the country, indeed essential, that [governmental] service should depend upon meritorious performance rather than political service"); *Broadrick v. Oklahoma*, 413 U.S. 601, 616-17 (1973) (upholding, under *Letter Carriers*, restrictions on the political activities of state civil servants); *Clements v. Fashing*, 457 U.S. 957, 972 (1982) (upholding, under *Letter Carriers* and *Broadrick*, restrictions on the partisan political activities of state officeholders).

Accordingly, any minimal burden on plaintiffs' associational rights is amply justified by the important state interests advanced by the ban on paid lobbying: protecting against corruption and its appearance among public officeholders. *See Fla. Ass'n of Pro. Lobbyists*, 525 F.3d at 1080 (recognizing the state has "a compelling interest in self-protection in the face of coordinated pressure campaigns directed by lobbyists" and in "allow[ing] voters to appraise the integrity and performance of officeholders and candidates, in view of the pressures they face" (citation and internal quotation marks omitted)).

## II.     In-Office Lobbying Restrictions Are Well-Established Nationwide as Measures That Prevent Corruption and its Appearance.

Strict scrutiny in this case is unwarranted for the reasons explained in *supra* Part I. However, even if this law is subject to strict scrutiny, it is justified by the compelling interest of

preventing quid pro quo corruption and should be assessed against the backdrop of widespread adoption of similar laws across the country.

**A. Preventing the actuality and appearance of quid pro quo corruption is a compelling governmental interest.**

"In a series of cases over the past 40 years," the Supreme Court has repeatedly recognized the government's interest in combatting "'quid pro quo' corruption [and] its appearance." *McCutcheon*, 572 U.S. at 192. Indeed, given the threat posed by actual and apparent corruption to "the integrity of our system of representative democracy," *Buckley*, 424 U.S. at 26-27, the Court has recognized that this anti-corruption interest "may properly be labeled 'compelling,'" capable of withstanding even strict scrutiny review, *McCutcheon*, 572 U.S. at 199 (quoting *FEC v. Nat'l Conservative PAC*, 470 U.S. 480, 496 (1985)).

In addition, maintaining public confidence in the integrity of elections and government has been deemed nearly as important as preventing actual corruption in the first instance. As the Supreme Court explained in *Buckley*, "[o]f almost equal concern as the danger of actual quid pro quo arrangements is the impact of the *appearance* of corruption stemming from public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions." 424 U.S. at 27 (emphasis added). "Democracy works 'only if the people have faith in those who govern, and that faith is bound to be shattered when high officials and their appointees engage in activities which arouse suspicions of malfeasance and corruption.'" *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 390 (2000) (citation omitted).

These parallel interests—preventing both political corruption and the appearance of such corruption—have been found to justify a broad range of public integrity measures, including: limits on campaign contributions, *see, e.g.*, *McConnell*, 540 U.S. at 143; bans on campaign contributions from governmental contractors, licensees, and lobbyists in view of the heightened corruption concerns they pose, *see Wagner v. FEC*, 793 F.3d 1 (D.C. Cir. 2015) (en banc) (upholding prohibition on campaign contributions from federal governmental contractors), *Preston*, 660 F.3d at 729 (upholding prohibition on lobbyists' contributions to candidates); limits and bans on gifts to officeholders, *see Schickel*, 925 F.3d at 870; and even direct restrictions on a candidate's or officeholder's solicitation of contributions or gifts, *see McConnell*, 540 U.S. at 95 (upholding prohibition on federal candidates' and officeholders' solicitation of campaign

contributions); *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 444 (2015) (upholding ban on judicial candidates' solicitation of campaign contributions).

The effort to avoid even the appearance of corruption or self-dealing has been recognized as particularly crucial in connection to the conduct of public officeholders—in contrast, for example, to campaign activity by private entities, *cf. Citizens United v. FEC*, 558 U.S. 310 (2010). In particular, the Supreme Court has repeatedly upheld standards for judicial conduct that aim to prevent not only the reality of quid pro corruption but also the appearance of corruption or bias. *See Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 889 (2009) (judicial codes of conduct "are the principal safeguard against judicial campaign abuses that threaten to imperil public confidence in the fairness and integrity of the nation's elected judges") (internal quotation marks omitted); *Williams-Yulee*, 575 U.S. at 435 ("[P]ersonal appeals for money by a judicial candidate inherently create an appearance of impropriety that may cause the public to lose confidence in the integrity of the judiciary.").

Although the judiciary's need to protect its impartiality may be unique, it is no less critical to avoid an "appearance of impropriety" with respect to legislative and executive branch officeholders. Like judicial canons, ethics rules safeguard the integrity of the political branches and bolster public confidence in the accountability of government. *See, e.g.*, *Schickel*, 925 F.3d at 880 (noting that Kentucky's lobbyist "gift ban . . . avoid[s] the reality or appearance that important state legislation is being bought and sold in private"). This was the conclusion of the federal district court in *Ziegler*, which found that Missouri's two-year post-employment ban on paid lobbying by officeholders "targets quid pro quo corruption and its appearance, rather than only influence and access," 2023 WL 2719472, at *4, and "renders less widespread the appearance of such conduct," *id*. at *6.[2]

Florida's in-office lobbying restrictions similarly seek to protect the integrity of Florida's democratic system and likewise are narrowly tailored to advance these widely recognized and compelling governmental interests. Importantly, the In-Office Restrictions focus on when a public

---

[2]    As the *Ziegler* district court found, the intent of Missouri's lobbying ban to "target" quid pro quo corruption was underscored by its focus on "paid lobbying activities, rather than lobbying that a former public official may undertake on a pro bono basis." 2023 WL 2719472, at *4. This feature also served to distinguish *Ziegler* from an earlier decision by the court in *Brinkman v. Budish*, 692 F. Supp. 2d 855 (S.D. Ohio 2010), which found that Ohio's ban on *uncompensated* lobbying did not target quid pro quo transactions (but that its ban on compensated lobbying did).

servant's power is at its height: while they are in office or public employment. A public official occupies a unique and privileged position, laden with inducements for anyone seeking governmental action or favor. Even basic knowledge about how to navigate the levers of government and bureaucracy most effectively can be of enormous value. Further, the Amendment focuses only on compensated lobbying; it is not restricting speech, but merely the ability to be paid for certain kinds of employment. Like the ban upheld in Missouri, the Amendment "specifically limits its scope to paid lobbying activities," *Ziegler*, 2023 WL 2719472, at *4, thus targeting the kind of lobbying most susceptible to the actuality and appearance of quid pro quo corruption. The In-Office Restrictions thus not only focus on the period when the risk of abuse is most acute, but also sweep no more broadly than necessary to effectuate their vital anti-corruption purposes.

**B. Jurisdictions nationwide have recognized that paid lobbying by public officeholders poses unique corruption concerns and—like Florida—have taken steps to restrict it.**

Far from being an outlier or "unprecedented," as plaintiffs contend, *see* Pls.' MSJ at 14, Florida's In-Office Restrictions find analogues in a wide range of laws adopted by other states to combat corruption and its appearance. In reviewing the decision by Florida voters to bar their public officials from lobbying while in office, this Court should consider the myriad other jurisdictions across the country that have implemented similar restrictions on public officials; the shared concerns that animated them; and the court decisions that have upheld such laws as valid anti-corruption tools.

At least eighteen other states and the District of Columbia[3] have enacted various in-office restrictions on lobbying. Several of these states have restrictions that similarly limit paid lobbying while a public servant remains in office. For example, Alabama prohibits elected officials from serving "for a fee as a lobbyist . . . before any legislative body or any branch of state or local government." Ala. Code § 36-25-23(a). Indiana law provides that "legislative person may not receive compensation or reimbursement other than from the state for personally engaging in lobbying." Ind. Code § 2-7-5-1.

---

[3]   *See, e.g.*, Ala. Code § 36-25-23(a); Ark. Code Ann. § 21-8-103(a); Conn. Gen. Stat. § 2-16a; D.C. Code Ann. § 1-1162.31(f); Ind. Code § 2-7-5-1; Iowa Code § 68B.5A; Kan. Stat. Ann. § 46.232; Ky. Rev. Stat. Ann. § 6.811(8); Me. Stat. tit. 1, § 1014; Minn. Stat. § 3.084; Miss. Code Ann. § 5-8-13(4); Mo. Const. art. III, § 2(a); N.H. Rev. Stat. Ann. § 21-G:25(I); N.J. Stat. Ann. § 52:11-71; N.C. Gen. Stat. § 120C-304(a)(1); Okla. Stat. tit. 74, § 4254; Or. Rev. Stat. § 171.756(4); S.C. Code Ann. § 2-17-15; Tex. Gov't Code § 556.005; W. Va. Code § 6B-3-2.

Maine includes "[a]ppearing for, representing or advocating on behalf of another before the Legislature, unless without compensation" as a prohibited conflict of interest. Me. Stat. tit. 1, § 1014. Minnesota prohibits sitting members of the legislature "from accepting employment with or otherwise receiving compensation for services performed from a business whose primary source of revenue is derived from lobbying," or any other business employing lobbyists if the lawmaker's job includes acting as a lobbyist. Minn. Stat. § 3.084. The Missouri Constitution prohibits members or employees of the general assembly from "act[ing] or serv[ing] as a paid lobbyist, register[ing] as a paid lobbyist, or solicit[ing] prospective employers or clients to represent as a paid lobbyist during the time of such service." Mo. Const. art. III, § 2(a).

Oklahoma prohibits state officers and employees from receiving "any additional compensation or reimbursement from any person for personally engaging in lobbying." 74 Okla. Stat. tit. 74, § 4254. In Oregon, legislative or executive officials "may not receive consideration other than from the State of Oregon for acting as a lobbyist in Oregon." Or. Rev. Stat. § 171.756. North Carolina prohibits legislators and other public servants from "engag[ing] in lobbying for payment" while in office. N.C. Gen. Stat. §§ 120C-304(a)(1), 120C-100(19). Finally, West Virginia prohibits senior officials from "registering as lobbyists" during their term of public employment. W. Va. Code § 6B-3-2. West Virginia defines a "lobbyist" as one who engages in lobbying for "economic consideration." *Id.* § 6B-3-1.

Other states also have prohibitions on in-office lobbying, but they may define prohibited lobbying beyond just lobbying for compensation. For example, several states define lobbyists to include those who make lobbying expenditures above a certain threshold, regardless of whether the lobbyist receives compensation. *See, e.g.*, Iowa Code Ann. § 68B.2 (including as a lobbyist one who makes expenditures of more than one thousand dollars in a calendar year); Conn. Gen. Stat. § 1-91(12) (including as a lobbyist one who, in furtherance of lobbying, makes or agrees to make expenditures of three thousand dollars or more in a calendar year). Additionally, several other states that do not limit in-office lobbying have rules barring lobbyists from the floor of the legislative chamber during votes unless by invitation, which operate as de facto in-office lobbying restrictions. *See, e.g.*, Ga. Stat. § 21-5-76; S.D. Codified Laws § 2-12-8; Wis. Stat. § 13.71.

Florida voters thus were not venturing into unchartered territory when nearly 80% of the electorate approved Amendment 12. They voted for a well-established, widely adopted type of restriction on paid lobbying for currently serving public officials.

And these types of restrictions have been so widely adopted precisely because they prevent actual and apparent conflicts of interest between an official's duty as a public servant and the priorities imposed by a potentially more lucrative paid lobbying job. For example, members of the U.S. House of Representatives are prohibited from working as lobbyists because of the clear conflicts of interest and the appearance of corruption that can occur "in the clash of [their] responsibilities [to their private clients] and the divergence of public and private interests on a particular governmental matter or in general government policy." Staff of H. Comm. on Ethics, 117th Cong., House Ethics Manual 216 (Comm. Print 2022). In passing this restriction, the House aimed to prevent members of Congress from earning "any income that could be funneled from lobbyists to Members under the guise of personal services." *Id.* This sentiment reflects an obvious truth: when public officials use or appear to use their power and influence gained in a position of public trust to secure political favors for private clients, it breeds corruption and harms public trust.

Recent experience well illustrates how permitting public servants to act as lobbyists erodes the citizenry's faith in democratic governance and institutions and creates an intolerable risk of public corruption.

For example, former Illinois state representative Luis Arroyo was arrested in November 2019 for attempting to bribe a state senator to support sweepstakes gambling legislation. At the time, Arroyo was a registered lobbyist, lobbying Chicago city government on behalf of a client that operates the gambling machines. While bribes are clearly illegal, Illinois law did not prohibit Arroyo, as an elected official, from lobbying on behalf of clients in other levels of government.[4] The scandal prompted the Illinois legislature to introduce legislation banning sitting members from lobbying while in office.[5]

Scandal erupted in Texas in the early 2000s when the public learned of lobbying efforts by then-state senator Jeff Wentworth and then-state representative Rick Green on behalf of Metabolife International Inc., a now-defunct multilevel marketing company that manufactured supplements containing ephedrine. The two lawmakers lobbied the state health department to

---

[4]   Dan Petrella & Jenny Whidden, *A slew of ex-state lawmakers face criminal charges, but critics question whether proposed reforms are enough for Illinois' 'very vibrant culture of corruption'*, Chicago Trib. (May 3, 2021), https://www.chicagotribune.com/politics/ct-illinois-lawmakers-ethics-20210503-6pcaz7bhkfaebcbwasok5tlnme-story.html.

[5]   5 Ill. Comp. Stat. 420/2-101, https://www.ilga.gov/legislation/billstatus.asp?DocNum=4042&GAID=15&GA=101&DocTypeID=HB&LegID=122792&SessionID=108.

prevent labeling on Metabolife's herbal supplements that would include a hotline number for informing the FDA of adverse reactions to the products.[6] The lawmakers lobbied against this labeling requirement despite extensive studies on ephedrine showing "a wide array of possible side effects, including anxiety, insomnia, hypertension, tachycardia, psychosis, kidney damage, dependency, heart attack, stroke and death."[7] The scandal prompted Texas to adopt stricter rules on lobbying by public officials. *See* Tex. Gov't Code § 556.005 (prohibiting state agencies from using appropriated funds to pay anyone required to register as a lobbyist).

Elsewhere, a Minnesota state representative's employment with a Washington D.C.-area lobbying firm provided traction for a law that took effect in 2022 restricting legislators from working for lobbying firms or working as lobbyists for any business that employs or contracts with lobbyists.[8]

In 2016, Ohio Speaker of the House Larry Householder, his political consultant, and three lobbyists engaged in lobbying efforts, later found to be criminal, to ensure the passage of a billion-dollar nuclear plant bailout and to defeat a ballot campaign to repeal the bailout. While Householder was not registered as a lobbyist, he was functioning as one: he took money from a private entity to advance its legislative (and commercial) interests, and he used his power and connections to do it. In March of 2023, Speaker Householder and co-conspirator Mathew Borges were found guilty by a federal jury of participating in a racketeering conspiracy.[9] Ohio does not have a law preventing lawmakers from lobbying on behalf of paid, private clients, but after Speaker

---

[6]   *Lobbying may have violated state law*, My Plainview (Oct. 12, 2002), https://www.my plainview.com/news/article/Lobbying-may-have-violated-state-law-8750772.php.

[7]   Mary Duffy, *Side Effects Raise Flag on Dangers of Ephedra*, N.Y. Times (Oct 12, 1999), https://www.nytimes.com/1999/10/12/health/side-effects-raise-flag-on-dangers-of-ephedra.html.

[8]   Brian Bakst, *Lobbying Law Could Squeeze Some Minnesota Legislators*, MPR News (Dec. 16, 2022), https://www.mprnews.org/story/2022/12/16/lobbying-law-could-squeeze-some-minnesota -legislators.

[9]   Press Release, U.S. Attorney's Office, Southern District of Ohio, *Jury convicts former Ohio House Speaker, former chair of Ohio Republican Party of participating in racketeering conspiracy* (Mar. 9, 2023), https://www.justice.gov/usao-sdoh/pr/jury-convicts-former-ohio-house-speaker-former-chair-ohio-republican-party.

Householder's arrest and subsequent conviction, state lawmakers are considering policy reform to prevent another scandal.[10]

All of these officials used their positions of public trust to work not on the *public's* behalf, but on behalf of moneyed special interests and in service of accumulating more power and influence. Corruption, as evinced by what has unfolded in states across the country, is the foreseeable consequence of a system where public servants are permitted to serve as paid lobbyists and to subordinate the interests of their constituents to those of their deep-pocketed benefactors. Although some of the officials may face jail time, it is the public and the democratic institutions that rely on the public's trust that suffer the most from this corruption.

Often, the corruption resulting from officeholders' participation in lobbying on behalf of private entities only becomes publicly known because the conduct rose to the level of a criminal offense. But Floridians should not have to wait until a crime is committed to have their trust safeguarded. The In-Office Restrictions prevent public officials from using the power of their position, the influence they wield, and the leverage they accrue while in office for their own or a paying client's private benefit.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment should be granted and plaintiffs' remaining claims dismissed.

---

[10] Andrew Tobias, *Corporate jets, bribes and dark money: Householder trial spotlights weaknesses in Ohio ethics laws*, Cleveland Plain Dealer (Jan. 29, 2023), https://www.cleveland.com/news/2023/01/corporate-jets-bribes-and-dark-money-householder-trial-spotlights-weaknesses-in-ohio-ethics-laws.html.

**Dated: June 12, 2023**

Respectfully submitted,

/s/ Simone Leeper
_____
Simone Leeper (FL Bar No. 1020511)
CAMPAIGN LEGAL CENTER
1101 14th Street NW, Ste. 400
Washington, DC 20005
(202) 736-2200
sleeper@campaignlegal.org

*Counsel for Amicus Curiae*