## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 22-cv-24156-BLOOM/Otazo-Reyes

**RENÉ GARCIA** and **JAVIER FERNÁNDEZ**,

       Plaintiffs,

v.

**KERRIE J. STILLMAN**, EXECUTIVE DIRECTOR,
FLORIDA COMMISSION ON ETHICS, in her official
capacity; **GLENTON GILZEAN, JR.**, CHAIRMAN,
FLORIDA COMMISSION ON ETHICS, in his official
capacity; **DON GAETZ**, VICE CHAIRMAN, FLORIDA
COMMISSION ON ETHICS, in his official capacity;
**MICHELLE ANCHORS**, COMMISSIONER,
FLORIDA COMMISSION ON ETHICS, in her official
capacity; **WILLIAM P. CERVONE**, COMMISSIONER,
FLORIDA COMMISSION ON ETHICS, in his official
capacity; **JOHN GRANT**, COMMISSIONER, FLORIDA
COMMISSION ON ETHICS, in his official capacity;
**WILLIAM N. MEGGS**, COMMISSIONER,
FLORIDA COMMISSION ON ETHICS, in his official
capacity; **ED H. MOORE**, COMMISSIONER,
FLORIDA COMMISSION ON ETHICS, in his official
capacity; **WENGAY M. NEWTON, SR.**, COMMISSIONER,
FLORIDA COMMISSION ON ETHICS, in his official capacity;
**JIM WALDMAN**, COMMISSIONER, FLORIDA COMMISSION
ON ETHICS, in his official capacity; **ASHLEY MOODY**,
ATTORNEY GENERAL, STATE OF FLORIDA, in her official
capacity; and **JIMMY PATRONIS**, CHIEF FINANCIAL
OFFICER, STATE OF FLORIDA, in his official capacity,

       Defendants.

_____/

## OMNIBUS ORDER ON *DAUBERT* MOTION AND
## MOTIONS FOR SUMMARY JUDGMENT

      **THIS CAUSE** is before the Court upon Plaintiffs René Garcia and Javier Fernández's

*Daubert* Motion to Exclude Defendants' Expert Witness, ECF No. [80] ("*Daubert* Motion"),

Plaintiffs' Motion for Summary Judgment and Permanent Injunction, ECF No. [82] ("Plaintiffs'

Summary Judgment Motion"), and the Motion for Summary Judgment filed by Defendants Kerrie Stillman, John Grant, Glenton Gilzean, Jr., Michelle Anchors, William Cervone, Don Gaetz, William Meggs, Ed Moore, Wengay Newton, Sr., Jim Waldman, Ashley Moody, and Jimmy Patronis, ECF No. [85] ("Defendants' Summary Judgment Motion"). The Motions are fully briefed.[1] The Court has considered the parties' submissions, the record as a whole, the applicable law, and is otherwise fully advised. For the reasons set forth below, Plaintiffs' *Daubert* and Summary Judgment Motions are granted, and Defendants' Summary Judgment Motion is denied.

## I. BACKGROUND

On December 21, 2022, René Garcia, Javier Fernández, Crystal Wagar, Mack Bernard, and William Proctor initiated this case against Florida Attorney General Ashley Moody, Florida Chief Financial Officer Jimmy Patronis, and the following members of the Florida Commission on Ethics: Kerrie Stillman, John Grant, Glenton Gilzean, Jr., Michelle Anchors, William Cervone, Don Gaetz, William Meggs, Ed Moore, Wengay Newton, Sr., and Jim Waldman. ECF No. [1]. In their Complaint, Plaintiffs asserted facial and as-applied constitutional challenges to Article II, Section 8(f) and 8(h)(2) of the Florida Constitution (the "Amendment") and Fla. Stats. §§ 112.3121-112.3122 (the "Implementing Statutes"). *Id*. The Court will refer to the Amendment and Implementing Statutes in combination as the "Lobbying Restrictions." Plaintiffs asserted a claim for Declaratory Judgment (Count I) and a claim for violation of the First and Fourteenth Amendments to the United States Constitution (Count II). *Id*. at 14-18.

---

[1] Defendants filed a Response to Plaintiffs' *Daubert* Motion, ECF No. [88], to which Plaintiffs filed a Reply. ECF No. [90]. Defendants filed a Response to Plaintiffs' Summary Judgment Motion, ECF No. [94], to which Plaintiffs filed a Reply. ECF No. [96]. Plaintiffs filed a Response to Defendants' Summary Judgment Motion, ECF No. [91], to which Defendants filed a Reply. ECF No. [98]. The Court has also considered the Amicus Brief filed by Campaign Legal Center. ECF No. [105].

On February 28, 2023, the Court issued a Preliminary Injunction, enjoining Defendants from enforcing Article II, Section 8(f)(2) of the Florida Constitution. ECF No. [52]. The Court explained that the Lobbying Restrictions consist of two separate prohibitions, which the Court termed the "In-Office Restrictions" and the "Post-Office Restrictions." *Id*. at 6-7.[2] The Court held that none of the Plaintiffs had standing to challenge the Post-Office Restrictions, but Plaintiffs Garcia and Fernández had standing to challenge the In-Office Restrictions. The Court further determined that Plaintiffs showed a likelihood of success on the merits of their claim that the In-Office Restrictions violate the First Amendment. *Id*. at 21. Finding the other preliminary injunction factors in Plaintiffs' favor, the Court preliminarily enjoined enforcement of the In-Office Restrictions during the pendency of this case. *Id*. at 23.

The Court subsequently dismissed Count I of the Complaint as duplicative of Count II. ECF No. [65] at 18-19. The Court also dismissed the claims of Crystal Wagar, Mack Bernard, and William Proctor for lack of standing. *See* ECF Nos. [49], [65].

In their Summary Judgment Motion, the remaining Plaintiffs—Garcia and Fernández—assert they are entitled to summary judgment on Count II because the In-Office Restrictions violate the First Amendment. ECF No. [82]. Plaintiffs seek a permanent injunction enjoining Defendants from enforcing the In-Office Restrictions. In Defendants' Summary Judgment Motion, Defendants assert that Plaintiff Fernández lacks standing and the In-Office Restrictions do not violate the United States Constitution. ECF No. [85] at 22.

In their *Daubert* Motion, Plaintiffs seek to exclude the testimony of Plaintiffs' expert witness, Craig Holman ("Holman"), because he is not qualified, his opinions are unreliable, and

---

[2] Unless stated otherwise, the Court cites to the page numbers, generated by the CM/ECF filing system, which appear in blue at the top right corner of all filings.

his testimony will not assist the factfinder. ECF No. [80]. Defendants respond that Holman's testimony is reliable and supported by empirical research. ECF No. [88].

## II.    MATERIAL FACTS

Based on the parties' statements of material facts,[3] along with the evidence in the record, the following facts are not in dispute.

During 2017 and 2018, Florida's Constitutional Revision Commission ("CRC") held hearings throughout Florida "to listen to input from Floridians about potential changes to the Florida Constitution." ECF No. [87-6]. The CRC developed eight proposed amendments. ECF No. [87-2]. At issue in this litigation is a proposed amendment entitled "Lobbying and Abuse of Office by Public Officers" ("Amendment"), sponsored by CRC Commissioner Don Gaetz. Def. SMF ¶ 28, ECF No. [86]. The Amendment, as proposed, was enacted into law on November 6, 2018, when 78.9% of Floridians voted in its favor. ECF No. [36-1].

Consequently, Article II Section 8 of the Florida Constitution was amended to place significant limits on compensated lobbying by current and former "public officer[s]," whom the Amendment defines as:

> a statewide elected officer, a member of the legislature, a county commissioner, a county officer pursuant to Article VIII or county charter, a school board member, a superintendent of schools, an elected municipal officer, an elected special district officer in a special district with ad valorem taxing authority, or a person serving as a secretary, an executive director, or other agency head of a department of the executive branch of state government.

*Id.* § 8(f)(1).

---

[3]Plaintiffs supported their Motion with a Statement of Material Facts, ECF No. [83] ("Pl. SMF"). Defendants filed a Counter Statement of Material Facts, ECF No. [95] ("Def. CSMF").

Defendants supported their Motion with a Statement of Material Facts, ECF No. [86] ("Def. SMF"). Plaintiffs filed a Counter Statement of Material Facts, ECF No. [92] ("Pl. CSMF"). Defendants filed a Reply Statement of Material Facts. ECF No. [97] ("Def. RSMF").

Section 8(f)(2) prohibits public officers from engaging in certain types of compensated lobbying while in office:

> (2) A public officer shall not lobby for compensation on issues of policy, appropriations, or procurement before the federal government, the legislature, any state government body or agency, or any political subdivision of this state, during his or her term of office.

Fla. Const. Art. II § 8(f)(2) (the "In-Office Restrictions").

Section 8(f)(3) extends the lobbying restrictions "for a period of six years after vacation of the public position." *Id.* § 8(f)(3) (the "Post-Office Restrictions"). However, unlike the In-Office Restrictions, the Post-Office Restrictions are tailored depending on the public officer's former position, as follows:

> a.   A statewide elected officer or member of the legislature shall not lobby the legislature or any state government body or agency.
>
> b.   A person serving as a secretary, an executive director, or other agency head of a department of the executive branch of state government shall not lobby the legislature, the governor, the executive office of the governor, members of the cabinet, a department that is headed by a member of the cabinet, or his or her former department.
>
> c.   A county commissioner, a county officer pursuant to Article VIII or county charter, a school board member, a superintendent of schools, an elected municipal officer, or an elected special district officer in a special district with ad valorem taxing authority shall not lobby his or her former agency or governing body.

*Id.* § 8(f)(3).

The Amendment authorizes the Florida Legislature to enact implementing legislation "including, but not limited to, defining terms and providing penalties for violations." *Id.* § 8(f)(5). On May 26, 2022, the Implementing Statutes were signed into law. *See* Implementation of the Constitutional Prohibition Against Lobbying by a Public Officer, 2022 Fla. Sess. Law Serv. Ch. 2022-140 (C.S.C.S.H.B. 7001) at Sec. 3. The Implementing Statutes create penalties for violations

of the Amendment, including "[p]ublic censure and reprimand," "[a] civil penalty not to exceed $10,000," and "[f]orfeiture of any pecuniary benefits received for conduct that violates this section." Fla. Stat. § 112.3122(4). The Implementing Statutes also define many terms that appear in the Amendment, including "Lobby," "Lobby for compensation," "Issue of appropriation," "Issue of policy," and "Issue of procurement." *See generally id*. § 112.3121. The Implementing Statutes went into effect on December 31, 2022. *Id.* § 112.3122(1).

Plaintiff Fernández is an attorney and partner in a law firm. Pl. SMF ¶ 21, ECF No. [83]. He has an active legal practice "in the areas of land use & zoning, real estate, incentive work related to community redevelopment districts and procurement." *Id*. He has been Mayor of the City of South Miami since November 2022. *Id*. He asserts that, due to his fear of violating the In-Office Restrictions, he has declined to represent certain clients on issues of "policy," "procurement," and "appropriations." *Id*.

Plaintiff Garcia is a Miami-Dade County Commissioner and Executive Vice President of New Century Partnership, a company that "provides marketing, public relations, and governmental affairs consulting services." *Id*. ¶ 22. Garcia asserts that the In-Office Restrictions have "prevented his consulting company from taking on lobbying clients and he has specifically turned down at least two clients that sought lobbying services to assist with seeking 'appropriations' in Tallahassee from the Florida Legislature." *Id*.

### III.   LEGAL STANDARD

#### A.   Standing

A plaintiff must make three showings to demonstrate Article III standing. "First, he must establish that he has suffered an 'injury in fact'— an invasion of a legally protected interest that is both (1) 'concrete and particularized' and (2) 'actual or imminent, not conjectural or

hypothetical.'" *Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198, 1201 (11th Cir. 2021) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). Second, he must demonstrate a "causal connection" between his injury and the complained-of conduct. *Id.* Third, "he must show that it is 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Id.* (quoting *Lujan*, 504 U.S. at 560).

Courts apply "the injury-in-fact requirement most loosely where First Amendment rights are involved, lest free speech be chilled even before the law or regulation is enforced." *Harrell v. The Florida Bar*, 608 F.3d 1241, 1254 (11th Cir. 2010) (citation omitted). To demonstrate a First Amendment injury before enforcement, a plaintiff must show that he intends "to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by [the challenged] statute, and there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quotation marks omitted). However, "[a] party's subjective fear that she may be prosecuted for engaging in expressive activity will not be held to constitute an injury for standing purposes unless that fear is objectively reasonable." *Wilson v. State Bar of Ga.*, 132 F.3d 1422, 1428 (11th Cir. 1998) (quotation marks omitted).

**B. First Amendment Overbreadth Doctrine**

The First Amendment "prohibits the political restriction of speech in simple but definite terms: 'Congress shall make no law . . . abridging the freedom of speech.'" *Otto v. City of Boca Raton, Fla.*, 981 F.3d 854, 860 (11th Cir. 2020) (quoting U.S. Const. amend. I). "Those same terms, and their guarantee of free speech, now apply to states[.]" *Id.* at 860-61 (citation omitted). The First Amendment overbreadth doctrine allows a plaintiff "to challenge a statute not because [his] own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from

constitutionally protected speech or expression." *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973). To succeed on a First Amendment overbreadth challenge, the plaintiff must show that a "substantial number of [the statute]'s applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quotation marks omitted).

### C. *Daubert* Standard

"In federal trials, district courts must act as 'gatekeep[ers]' to 'ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" *Knepfle v. J-Tech Corp.*, 48 F.4th 1282, 1293 (11th Cir. 2022) (alteration in the original) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 & n.7 (1993)). Pursuant to Federal Rule of Evidence 702, trial courts must consider whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). The proponent of expert testimony bears the burden to show that all three factors are met. *Id*.

### D. Summary Judgment

A court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The parties may support their positions by citations to materials in the record, including depositions, documents, affidavits, or declarations. *See* Fed. R. Civ. P. 56(c). "A factual dispute is 'material' if it would affect the outcome of the suit under the governing law, and 'genuine' if a

reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).

A court views the facts in the light most favorable to the non-moving party, draws "all reasonable inferences in favor of the nonmovant and may not weigh evidence or make credibility determinations[.]'" *Lewis v. City of Union City, Ga.*, 934 F.3d 1169, 1179 (11th Cir. 2019); *see also Crocker v. Beatty*, 886 F.3d 1132, 1134 (11th Cir. 2018) ("[W]e accept [the non-moving party's] version of the facts as true and draw all reasonable inferences in the light most favorable to [ ] the non-movant." (citation omitted)). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which a jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. "If more than one inference could be construed from the facts by a reasonable fact finder, and that inference introduces a genuine issue of material fact, then the district court should not grant summary judgment." *Bannum, Inc. v. City of Fort Lauderdale*, 901 F.2d 989, 996 (11th Cir. 1990) (citation omitted).

### E.  Permanent Injunction

A party seeking a permanent injunction must show "(1) an irreparable injury, (2) the lack of an adequate remedy at law, (3) that the balance of hardships favors an injunction, and (4) that the injunction is consistent with the public interest." *Am. Civil Liberties Union of Fla., Inc. v. Byrd*, 608 F. Supp. 3d 1148, 1156 (N.D. Fla. 2022) (citing *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006)).

## IV.    DISCUSSION

The Court begins with Defendants' arguments challenging Plaintiff Fernández's standing. The Court then addresses the appropriate level of scrutiny to apply to the In-Office Restrictions. The Court then resolves Plaintiffs' *Duabert* Motion prior to examining Defendants' evidence. Lastly, the Court addresses the appropriate remedy.

### A.  Standing

Defendants raise a standing challenge only as to Plaintiff Fernández. ECF No. [85] at 4. They argue that, as a lawyer in private practice, he falls squarely within the In-Office Restrictions' exception for a "public or private employee . . . acting in the normal course of his or her duties[.]" Fla. Stat. § 112.3121(12)(b)2. Defendants assert that, because Fernández's conduct is exempted, his fear of prosecution is not reasonable, so he lacks Article III standing to challenge the In-Office Restrictions. ECF No. [85] at 4. Plaintiffs respond that Fernández has standing because his fear of violating the In-Office Restrictions has impacted his legal practice. ECF No. [91] at 2.

The In-Office Prohibitions prohibit "Lobby[ing] for compensation," which is defined as "being employed or contracting for compensation, for the purpose of lobbying, and includes being principally employed for governmental affairs to lobby on behalf of a person or governmental entity." Fla. Stat. § 112.3121(12)(a). Six situations are explicitly exempted from the definition of "lobbying for compensation," including the following:

> A public or private employee, including an officer of a private business, nonprofit entity, or governmental entity, acting in the normal course of his or her duties, unless he or she is principally employed for governmental affairs.

Fla. Stat. § 112.3121(12)(b)2 ("Normal Course of Duties Exception").

Defendants assert that Fernández falls squarely within the Normal Course of Duties Exception. He is a partner at a private law firm practicing in the areas of land use and real estate.

10

Fernández Dep. at 14:13,[4] ECF No. [87-4]. Although he works on "procurement" matters that might otherwise fall within the In-Office Restrictions' scope, Fla. Const. Art. II § 8(f)(2), he does so while representing clients as a "private employee . . . acting in the normal course of his . . . duties" as an attorney. Fla. Stat. § 112.3121(12)(b)2.

Plaintiffs respond that "[i]t is not at all clear that Mr. Fernández's conduct would not run afoul of the In-Office Lobbying Restrictions[.]" ECF No. [91] at 4. However, Plaintiffs do not address the specific exception cited by Defendants. Instead, Plaintiffs argue that Fernández has consistently expressed a fear of prosecution under the Lobbying Restrictions, and, in the First Amendment context, courts apply "the injury-in-fact requirement most loosely where First Amendment rights are involved, lest free speech be chilled even before the law or regulation is enforced." *Harrell v. The Florida Bar*, 608 F.3d 1241, 1254 (11th Cir. 2010) (citation omitted).

Defendants are correct that Fernández does not demonstrate standing by simply stating a fear of prosecution. He must also demonstrate that his fear of prosecution is "objectively reasonable." *Wilson*, 132 F.3d at 1428 (quotation marks omitted). Defendants have convincingly shown that Fernández's fear of prosecution is not objectively reasonable because the Normal Course of Duties Exception squarely applies to his situation. Despite Defendants' reliance on that Exception, Plaintiffs provide no argument as to why it would not apply to Fernandez. *See generally* ECF No. [91].

Moreover, as Defendants point out, "[a]ny anxieties Plaintiff Fernández has about the In-Office Restrictions' implications for his legal work could have been resolved by requesting an opinion from the Florida Commission on Ethics, a request which he has never attempted to make."

---

[4] When citing to deposition testimony, the Court cites to the page numbers generated by the stenographer, rather than the page number generated by the CM/ECF system.

ECF No. [94] at 2 (citing Fla. Stat. § 112.322(3)(a), which authorizes public officers to request an advisory opinion from the Commission on Ethics "when in doubt about the applicability" of Art. II, § 8 of the Florida Constitution); *see also U.S. Civil Serv. Comm'n. v. Nat'l Ass'n of Letter Carriers, AFL-CIO* ("*Letter Carriers*"), 413 U.S. 548, 580 (1973) ("It is also important in this respect that the Commission has established a procedure by which an employee in doubt about the validity of a proposed course of conduct may seek and obtain advice from the Commission and thereby remove any doubt there may be as to the meaning of the law, at least insofar as the Commission itself is concerned.").

The Court finds that Fernández's subjective fear is not objectively reasonable and does not constitute an injury for standing purposes. As such, Fernández lacks standing.[5]

### B.  Whether the In-Office Restrictions Violate the First Amendment

Garcia, the sole remaining Plaintiff, is a currently-serving public officer who seeks to engage in compensated lobbying. The Supreme Court has held that individuals do not forfeit their First Amendment rights by receiving compensation. *See, e.g.*, *United States v. National Treasury Employees Union* ("*NTEU*"), 513 U.S. 454, 468 (1995). Nor do they forfeit those rights altogether by accepting government employment. *Id.* at 465. At the same time, however, the Supreme Court has recognized that "[n]either the right to associate nor the right to participate in political activities is absolute," *Letter Carriers*, 413 U.S. at 567, and it has upheld "restraints on the job-related speech of public employees that would be plainly unconstitutional if applied to the public at large." *NTEU*, 513 U.S. at 465 (citing *Snepp v. United States*, 444 U.S. 507 (1980)).

---

[5] Although Garcia is now the sole remaining Plaintiff, the Court will continue to refer to "Plaintiffs" in the plural when discussing the arguments briefed.

Thus, while the parties agree that Plaintiff's lobbying activities are protected by the First Amendment to some extent, they vigorously debate what level of scrutiny applies. Plaintiffs argue for strict scrutiny because the In-office Restrictions are content-based restrictions on speech. ECF No. [82] at 2-3. Defendants urge the Court to apply intermediate scrutiny or *Pickering/NTEU* balancing instead. *See generally* ECF No. [85].

### i.    The Proposed Levels of Scrutiny

Plaintiffs argue that the Court must apply strict scrutiny because the In-Office Restrictions are "content-based restrictions of core political speech." ECF No. [82] at 8. "A content-based law is one that 'applies to particular speech because of the topic discussed or the idea or message expressed.'" *Otto*, 981 F.3d at 862 (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)). "Few categories of regulation have been as disfavored as content-based speech restrictions, which are presumptively invalid." *Id.* (quotation marks omitted). Such regulations "can be justified 'only if the government proves that they are narrowly tailored to serve compelling state interests.'" *Id.* at 868 (quoting *Reed*, 576 U.S. at 163).

Defendants urge the Court to apply the intermediate level of scrutiny used to evaluate "content-neutral" laws that merely regulate the time, place, and manner of speech. *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1475 (2022). Such regulations need only be "narrowly tailored to serve a significant government interest" and "leave open alternative channels for communication of the information." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (quoting *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293 (1984)).

Defendants alternatively argue that the Court should apply what they term "*Pickering/NTEU*" balancing, ECF No. [85] at 6, a balancing test that falls somewhere between strict and intermediate scrutiny. *See Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council*

*31*, 138 S. Ct. 2448, 2472 (2018) (noting that the *NTEU* test "more closely resembles exacting scrutiny"). This balancing test derives from *Pickering v. Board of Education*, 391 U.S. 563 (1968), wherein the Supreme Court recognized that "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Id.* at 568. Courts apply what has become known as the "*Pickering* test" to "arrive at a balance between the employee's interest in commenting on matters of public concern and his employer's interest in efficiently providing public services." *Moss v. City of Pembroke Pines*, 782 F.3d 613, 621 (11th Cir. 2015) (citation omitted).

A heightened version of the *Pickering* test applies to laws that function as a "wholesale deterrent to a broad category of expression by a massive number of potential speakers." *NTEU*, 513 U.S. at 467. In *NTEU*, the Supreme Court considered the constitutionality of a law that prohibited "nearly all employees of the Federal Government" from accepting honoraria for appearances, speeches, or articles. 513 U.S. at 459. The honoraria ban applied even when the employees' speech occurred "outside the workplace" and involved content unrelated to their government employment. *Id.* at 466. Because the honoraria ban "unquestionably imposes a significant burden on expressive activity" and "chills potential speech before it happens," the Court held that the government "must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government.'" *Id.* (quoting *Pickering*, 391 U.S. at 571).

The *NTEU* test requires the State to "demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way."

*NTEU*, 513 U.S. at 475 (quotation marks omitted). As the Eleventh Circuit has recognized, the *NTEU* test "places a heavy burden on the government[.]" *O'Laughlin v. Palm Beach Cnty.*, 30 F.4th 1045, 1054 (11th Cir. 2022).

Defendants argue that the applicability of the *NTEU* test "does not turn on whether the challenged law is content neutral[.]" ECF No. [85] at 16. They assert that a lack of content neutrality is merely a factor to consider in the *Pickering/NTEU* balancing test. Defendants' argument draws no support from the *NTEU* decision itself, which explained that the challenged law in that case did not "discriminate[ ] among speakers based on the content or viewpoint of their messages[.]" *NTEU*, 513 U.S. at 468. Even the dissenting opinion of *NTEU*—which Defendants rely upon—recognized that a content-based law is subject to strict scrutiny rather than *Pickering/NTEU* balancing. *See NTEU*, 513 U.S. at 490 (Rehnquist, C.J., dissenting) ("Unlike the law at issue in *Simon & Schuster*[*, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105 (1991)], the honoraria ban is neither content nor viewpoint based."); *see Simon & Schuster*, 502 U.S. at 115 ("A statute is presumptively inconsistent with the First Amendment if it imposes a financial burden on speakers because of the content of their speech." (citation omitted)). The primary out-of-circuit case cited by Defendants similarly recognized that "a content-based restriction on speech [is] subject to strict scrutiny." *Siefert v. Alexander*, 608 F.3d 974, 981 (7th Cir. 2010) (citations omitted).[6] Finally, Defendants' contention cannot be reconciled with the

---

[6] The *Siefert* court applied strict scrutiny to a provision it deemed content based, but it applied *Pickering* balancing to a separate provision that prohibited judges and judicial candidates from "[p]ublicly endors[ing] or speak[ing] on behalf of any partisan candidate or platform." 608 F.3d at 983 (alterations in the original). Plaintiff correctly points out that *Siefert*'s application of *Pickering* balancing is dubious because, since *Siefert* was issued, the Supreme Court clarified that strict scrutiny applies to content-based restrictions on judicial candidates' speech. *See Williams-Yulee v. Florida Bar*, 575 U.S. 433, 444 (2015).

principle "engrained in our First Amendment jurisprudence" that content-based laws are subject to strict scrutiny. *Simon & Schuster*, 502 U.S. at 508.

Accordingly, the Court rejects Defendants' contention that the *NTEU* balancing test applies even if the In-Office Restrictions discriminate on the basis of content. The Court adheres to the rule consistently stated by the Eleventh Circuit and Supreme Court that content-based regulations of speech "must satisfy strict scrutiny." *Otto*, 981 F.3d at 868; *Simon & Schuster*, 502 U.S. at 508.

### ii.       The In-Office Restrictions Are Content Based

Due to the importance of content neutrality in a First Amendment analysis, the parties dispute at length whether the In-Office Restrictions are content neutral. Plaintiffs argue that the In-Office Restrictions facially discriminate against "speech concerning 'issues of policy, appropriations or procurement.'" ECF No. [91] at 4 (quoting Fla. Const., Art. II, § 8(f)(2)). Defendants assert that "Florida's restriction is facially content neutral and does not have a content-based purpose or justification." ECF No. [85] at 16.

Defendants' assertion that the In-Office Restrictions are "facially content neutral" is inconsistent with the Amendment's text, which expressly prohibits compensated lobbying "on issues of policy, appropriations, or procurement[.]" Fla. Const., Art. II, § 8(f)(2). Because they are limited in scope to those three issues, the In-Office Restrictions, on their face, "regulate[ ] certain subject matters but not others." *Otto*, 981 F.3d at 862.

Defendants attempt to analogize the In-Office Restrictions to the ordinances at issue in *City of Austin*, 142 S. Ct. at 1471. In that case, the Supreme Court held that strict scrutiny was not triggered by Austin's sign regulation that "distinguishe[d] between on-premises and off-premises signs[.]" *Id*. at 1469. Although enforcement of the regulation required "reading a billboard to determine whether it directs readers to the property on which it stands," a sign's "substantive

16

message itself is irrelevant to the application of the provision[.]" *Id.* at 1472. The Supreme Court distinguished Austin's sign regulation from that at issue in *Reed*, 576 U.S. at 169, which contained "content-discriminatory classifications for political messages, ideological messages, or directional messages[.]"*City of Austin*, 142 S. Ct. at 1472. The *Reed* sign regulation was content based because it "single[d] out specific subject matter for differential treatment, even if it [did] not target viewpoints within that subject matter." *Id.* (quoting *Reed*, 576 U.S. at 169)). The Austin regulation, by contrast, merely "distinguish[ed] based on location," and was therefore subject to intermediate scrutiny. *Id.* at 1472.

The In-Office Restrictions are more akin to the *Reed* regulation than the *City of Austin* regulation. Like the sign regulation in *Reed*, the In-Office Restrictions single out topics for differential treatment: "issues of policy, appropriations, or procurement[.]" Fla. Const. Art. II § 8(f)(2). It therefore cannot be said, as was the case in *City of Austin*, that the "substantive message itself is irrelevant to the application of the [regulation.]" 142 S. Ct. at 1472. Rather, the "substantive message" of the lobbyist's speech determines whether his speech violates the In-Office Restrictions' prohibition of compensated lobbying on "issues of policy, appropriations, or procurement[.]" Fla. Const. Art. II § 8(f)(2). As *City of Austin* recognized, "regulations that discriminate based on 'the topic discussed or the idea or message expressed'" are content based. *Id.* at 1474 (quoting *Reed*, 576 U.S. at 171).

The Court agrees with Defendants that the "In-Office Restrictions' necessary definition of compensated lobbying does not render [them] content based simply because it requires some determination of 'who is the speaker and what is the speaker saying.'" ECF No. [94] at 3 (quoting *City of Austin*, 142 S. Ct. at 1471). The In-Office Restrictions' definition of "Lobby" is not, in itself, problematic. *See* Fla. Stat. § 112.3121(11)(a) (defining "Lobby" as "to influence or attempt

17

to influence an action or decision through oral, written, or electronic communication"). However, what renders the In-Office Restrictions content based is that they do not prohibit *all* compensated lobbying, but only compensated lobbying on "issues of policy, appropriations, or procurement[.]" Fla. Const. Art. II § 8(f)(2). In so doing, they "draw[ ] 'facial distinctions . . . defining regulated speech by particular subject matter[.]'" *NetChoice, LLC v. Att'y Gen., Fla.*, 34 F.4th 1196, 1223 (11th Cir. 2022) (quoting *Reed*, 576 U.S. at 163-64). *City of Austin* does not support the proposition that a statute that "single[s] out [a] topic or subject matter for differential treatment" can be anything other than content based. 142 S. Ct. at 1472.

Relatedly, Defendants argue that "Florida's restriction targets speech only based on its context; it is 'agnostic as to content,' such as whether an officeholder wants to lobby about a social or an economic issue, an education or insurance issue[.]" ECF No. [85] at 16. However, Defendants' argument ignores the plain text of Fla. Const. Art. II § 8(f)(2), which facially discriminates against three particular issues. Contrary to Defendants' assertion, the In-Office Restrictions target speech based on the context of the speech *and* its content. Contextual factors include the identity of the speaker (a public official), the identity of the listener (a government decision-making body), and the purpose of the conversation (to lobby). Even when all those contextual factors are present, the In-Office Restrictions do not apply unless the speech contains specific *content*: "issues of policy, appropriations or procurement." Fla. Const. Art. II § 8(f)(2). In light of the In-Office Restrictions' explicit targeting of those three issues, there is no merit to Defendants' contention that the In-Office Restrictions reflect "indifference to any particular issue being lobbied[.]" ECF No. [98] at 3.

Amicus Campaign Legal Center ("CLC") asserts that "far broader lobbying regulations are held to only intermediate scrutiny." ECF No. [105] at 9. However, it is not the breadth of the In-

Office Prohibitions that render them content-based, but rather the "facial distinctions" they draw between permitted and prohibited topics. *NetChoice*, 34 F.4th at 1223 (quotation marks omitted). Relatedly, CLC has convincingly shown that "In-Office Lobbying Restrictions are well-established nationwide," *id.* at 13, but CLC has not directed the Court to any federal or state statute that prohibits lobbying on some issues but not others. Indeed, the Court has reviewed each of the nineteen statutes cited by CLC, ECF No. [105] at 16 n.3, and determined that none facially discriminate among issues like the In-Office Restrictions.

For similar reasons, the In-Office Restrictions are distinguishable from the Florida statute at issue in *Florida League of Professional Lobbyists v. Division of Legislative Information Services*, 525 F.3d 1073 (11th Cir. 2008). That Florida statute addressed disclosure requirements "for any lobbying activity," wherein "lobby" was defined as "influencing or attempting to influence legislative action or nonaction through oral or written communication or an attempt to obtain the goodwill of a member or employee of the Legislature." *Id*. at 1079-80 (quoting Fla. Stat. § 11.045(1)(f)). That statute does not facially discriminate among issues. Indeed, a comparison of Fla. Stat. § 11.045(1)(f) and the In-Office Restrictions merely reveals that Florida lawmakers know how to craft a content-neutral lobbying regulation when they want to. As Defendants recognize, "the CRC intentionally limited" the scope of the In-Office Restrictions "to issues of policy, appropriation, or procurement[.]"[7] ECF No. [85] at 10.

In sum, the In-Office Restrictions are content based because they "defin[e] regulated speech by particular subject matter[.]" *NetChoice*, 34 F.4th at 1223 (quoting *Reed*, 576 U.S. at

---

[7] The CRC's reason for limited the In-Office Restrictions to three issues is discussed in the strict scrutiny analysis, *infra*.

163-64). As regulations that are "content based on their face," they "must satisfy strict scrutiny." *Reed*, 576 U.S. at 164.

### iii.     Applying Strict Scrutiny

"Under strict scrutiny, content-based restrictions 'are presumptively unconstitutional.'" *Otto*, 981 F.3d at 868 (quoting *Reed*, 576 U.S. at 163). Defendants therefore bear the burden of proving that the In-Office Restrictions are "narrowly tailored to serve compelling state interests." *Id.* (quoting *Reed*, 576 U.S. at 163). "The quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised." *Nixon v. Shrink Mo. Gov. PAC*, 528 U.S. 377, 391 (2000). Accordingly, prior to examining Defendants' evidence, the Court examines the asserted compelling interests and "the novelty and plausibility" of Defendants' assertion that the In-Office Restrictions further those interests. *Id.*

### 1.   The State's Compelling Interest

Defendants assert that the In-Office Restrictions are intended to address *quid pro quo* corruption or its appearance. ECF No. [85] at 8; *see McCutcheon v. Fed. Election Com'n*, 572 U.S. 185, 192 (2014) (defining *quid pro quo* corruption as "a direct exchange of an official act for money"). Indisputably, the prevention of *quid pro quo* corruption or its appearance is a compelling government interest. *Id.*

Defendants also assert that "[t]he State's interest here is protecting the 'public trust' of 'public office.'" ECF No. [85] at 7. The State certainly has a "legitimate interest in maintaining the public's confidence in the integrity of [government] service." *Crandon v. United States*, 494 U.S. 152, 164-65 (1990); *Waters v. Churchill*, 511 U.S. 661, 675 (1994) ("The government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively

20

subordinate interest when it acts as sovereign to a significant one when it acts as employer."). However, Defendants do not identify any cases where courts have recognized "public trust" of public office as a compelling interest that justifies a content-based restriction on speech. As the Supreme Court recently clarified within the context of Senate campaign contributions, the government does not have a compelling interest in "limit[ing] the appearance of mere influence or access" to legislators. *Fed. Election Comm'n v. Cruz*, 142 S. Ct. 1638, 1653 (2022) (quoting *McCutcheon*, 572 U.S. at 208). While "the line between *quid pro quo* corruption and general influence may seem vague at times, [ ] the distinction must be respected[.]" *Id*. at 1653.

Relatedly, Amicus CLC argues that there is a compelling state interest in combatting the "'appearance of impropriety' with respect to legislative and executive branch officeholders." ECF No. [105] at 15. In support, CLC relies on cases evaluating regulations of judges and judicial candidates. *See Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 889 (2009) (recognizing the "vital state interest" in safeguarding "public confidence in the fairness and integrity of the nation's elected judges."); *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 445 (2015) ("[P]ublic perception of judicial integrity is a state interest of the highest order." (quotation marks omitted)). However, CLC recognizes that "the judiciary's need to protect its impartiality may be unique[.]" ECF No. [105] at 15. Indeed, the Supreme Court has held that the judiciary is unique because "the role of judges differs from the role of politicians." *Williams-Yulee*, 575 U.S. at 446 (citation omitted). Whereas "[p]oliticians are expected to be appropriately responsive to the preferences of their supporters," judges "must observe the utmost fairness, striving to be perfectly and completely independent[.]" *Id*. at 446-47 (quotation marks omitted). Therefore, "a state's interest in preserving public confidence in the integrity of its judiciary *extends beyond* its interest in preventing the appearance of corruption in legislative and executive elections." *Id*. at 446 (emphasis added).

The only valid compelling interest asserted by Defendants is the State's interest in preventing *quid pro quo* corruption or its appearance. Defendants bear the burden of proving that the In-Office Restrictions are "narrowly tailored" to serve that interest. *Otto*, 981 F.3d at 868 (quoting *Reed*, 576 U.S. at 163).

### 2. Novelty and Plausibility that the In-Office Restrictions Prevent *Quid Pro Quo* Corruption or its Appearance

The Court next considers "the novelty and plausibility" of the State's justification for the In-Office Restrictions in order to determine "[t]he quantum of empirical evidence needed" for Defendants to meet their burden. *Nixon*, 528 U.S. at 391.

As Amicus CLC convincingly shows, in-office restrictions on lobbying are common throughout the United States. ECF No. [105] at 16. "At least eighteen other states and the District of Columbia have enacted various in-office restrictions on lobbying," and "[s]everal of these states have restrictions that similarly limit paid lobbying while a public servant remains in office." *Id*. Moreover, it is logical to target *compensated* lobbying because the introduction of money creates additional opportunities for *quid pro quo* corruption or its appearance. *See Brinkman v. Budish*, 692 F. Supp. 2d 855, 864 (S.D. Ohio, 2010) (finding that compelling interests were served by a prohibition on compensated lobbying but not uncompensated lobbying); *see also Miller v. Ziegler*, 582 F. Supp. 3d 640, 646 (W.D. Mo. 2022) ("[T]he public interest is different and greater when the lobbying activity is paid.").

Plaintiffs assert that "[n]o other state prohibits lobbying by local elected officials." ECF No. [82] at 15. That statement appears to be incorrect. While the in-office restrictions of *most* other states do not apply to local elected officials, *see* ECF No. [105] at 16 n.3 (citing nineteen in-office restrictions from other states and the District of Columbia), the Court has found five states with

statutes that apparently apply to all "public official[s]." Ala. Code § 36-25-23(a); *see also* Miss. Code Ann. § 5-8-13(4); N.H. Rev. Stat. § 21-G:25; Okla. Stat. tit. 74 § 4254; Or. Rev. Stat. § 171.756(4). Thus, while the In-Office Restrictions are broad in their application to local elected officials, they are not unprecedented in that regard. Prohibiting a local elected official from lobbying the federal government is even rarer, but Mississippi and Oklahoma's statutes appear to cover such activity. Miss. Code Ann. § 5-8-13(4); Okla. Stat. tit. 74 § 4254.

The Court's review of other states' restrictions on lobbying by public officials reveals that the In-Office Restrictions are distinct. No other state's in-office restrictions facially prohibit lobbying on some "issues" but not others. Fla. Const. Art. II § 8(f)(2). In addition to triggering strict scrutiny, this issue-based discrimination raises "a red flag" of underinclusiveness. *Williams-Yulee*, 575 U.S. at 449; *see also Reed*, 576 U.S. at 172 ("[A] law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction on truthful speech, when it leaves appreciable damage to that supposedly vital interest unprohibited[.]" (quotation marks omitted)). The In-Office Restrictions are underinclusive in that they do not prohibit a public official from receiving compensation to lobby on issues other "issues of policy, appropriations or procurement." Fla. Const. Art. II § 8(f)(2).

Additional underinclusiveness concerns arise from the Normal Course of Duties Exception, which exempts the lobbying activities of a public or private employee "acting in the normal course of his or her duties, unless he or she is principally employed for governmental affairs." Fla. Stat. § 112.3121(12)(b)2. Defendants concede that the effect of the Normal Course of Duties exception is to "prohibit elected officials from lobbying for private third parties as their 'principal job,'" while permitting an elected official to lobby "for his or her own private interests, or on behalf of his or her own business." Pl. SMF ¶ 19, ECF No. [83]; Def. CSMF ¶ 19, ECF No.

[95]. Defendants offer no explanation as to why *quid pro quo* corruption or its appearance is more likely when a public official lobbies on behalf of *another's* interests as opposed to *his own*. In prohibiting one situation but not the other, the In-Office Restrictions raise "doubts about whether the government is in fact pursuing the interest it invokes rather than favoring a particular speaker or viewpoint." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 802 (2011) (citations omitted). Thus, as Plaintiffs put it, Defendants must adduce evidence that "someone 'principally employed for government affairs' is [ ] more likely to create the appearance of corruption than someone lobbying to line their own pockets." ECF No. [91] at 15; *see Brown*, 564 U.S. at 802 (faulting a state for giving "no persuasive reason" why it "singled out" some speakers but not others "for disfavored treatment").

While the In-Office Restrictions are underinclusive in the two manners described, they are extremely broad in other respects. Unlike the Post-Office Restrictions, the scope of the In-Office Restrictions does not depend on the public officer's position. While serving in office, every public officer is subject to the same categorical ban on lobbying "before the federal government, the legislature, any state government body or agency, or any political subdivision of this state," regardless of whether the public officer is a "statewide elected officer," a "county commissioner" like Plaintiff René Garcia, or "a school board member." Fla. Const. Art. II § 8(f)(1-2). Upon leaving office, however, local elected officials are only prohibited from lobbying "their former agency or governing body[.]" Fla. Const., Art. II § 8(f)(3)(a)-(c). As Plaintiff correctly points out, ECF No. [82] at 18, the fact that the Post-Office Restrictions are narrowly tailored based on the public official's office raises the question as to why the In-Office Restrictions are not tailored in the same manner.

Plaintiffs additionally argue that the In-Office Restrictions unnecessarily duplicate other existing laws. ECF No. [82] at 17 (citing *Honeyfund.com, Inc. v. DeSantis*, 622 F. Supp. 3d 1159, 1179 (N.D. Fla. 2022) (law not narrowly tailored when it proscribes activity that was already prohibited by another statute). It is true that Florida law already prohibits public officials from using their office to obtain personal benefits. Fla. Stat. § 112.313(6)-(7). That duplication raises additional doubt as to the In-Office Restrictions' narrow tailoring.

The Court finds that the In-Office Restrictions simultaneously pose both overbreadth and underinclusiveness concerns. They broadly prohibit the speech of professional lobbyists who lobby on specific issues, yet they fully permit other types of lobbying activity. The State carries the heavy burden of assuaging these concerns with evidence that the In-Office Restrictions are in fact "narrowly tailored to serve" the compelling interest of preventing *quid pro quo* corruption or its appearance. *Otto*, 981 F.3d at 868 (quoting *Reed*, 576 U.S. at 163).

### 3. Plaintiff's *Daubert* Motion

Having established the state's burden of proof and the issues to be proven, the Court addresses Plaintiff's *Daubert* Motion related to Defendants' expert witness, Craig Holman, Ph.D. ("Holman). ECF No. [80]. Plaintiffs argue that Holman is not qualified to testify about the In-Office Restrictions, his testimony is unreliable, and his testimony will not help the trier of fact. Defendants respond that Holman has been studying the lobbying industry for over 20 years, his testimony is reliable and supported by a "Gallup poll" and a "Maryland survey," and his opinion will assist the trier of fact. ECF No. [88].

The Court begins by examining Holman's expert report. ECF No. [87-12]. Holman is a "Government affairs lobbyist with Public Citizen in Washington, D.C. ECF No. *Id.* at 2. The majority of Holman's report discusses the "revolving door" problem addressed by the Post-Office

Restrictions, which are not at issue in this case. *See* ECF No. *Id.* at 8-18. His report contains slightly over three pages discussing the In-Office Restrictions in particular. *Id*. at 5-8. He opines that public officials simultaneously serving as paid lobbyists create both "actual conflicts of interest" and an "appearance of a conflict of interest." *Id*. at 7. He also opines that the In-Office Restrictions address both "*actual* corruption" and "the *appearance* of corruption which inevitably emerge among citizens who observe their governmental representatives lobbying for any private interests." *Id*. at 4 (emphasis in the original).

The Court agrees with Plaintiffs that there are significant reasons to doubt Holman's qualifications to testify regarding the In-Office Restrictions. Holman testified that his work focused on the "revolving door" issue rather than in-office lobbying, which is "a fairly new issue" to him. ECF No. [87-11] at 37-38. Holman's Report and testimony reveal his lack of familiarity with the issue at hand. In Holman's Report, he asserts that "[a]t least 10 states prohibit legislators or other public officials from lobbying for compensation while serving in public office." ECF No. [87-12] at 5 (citing state laws). In his deposition, Holman explained that, after he drafted his report, Defendants' counsel alerted him to the existence of Missouri's law, which Holman had previously overlooked. Holman Dep. at 14-15, ECF No. [87-11]. Thus, with the assistance of Defendants' counsel, Holman identified eleven states other than Florida that prohibit lobbying by public officials while in office. *Id.* at 104.

However, as Amicus CLC points out, and the Court has verified, "[a]t least *eighteen* other states and the District of Columbia have enacted various in-office restrictions on lobbying." ECF No. [105] at 16 (emphasis added) (accurately citing state laws that Holman did not). Holman's severe undercounting and lack of awareness of other states' in-office lobbying prohibitions indicate a lack of expertise in this matter.

Turning to reliability, Plaintiff accurately characterizes Holman's opinions as "*ipse dixit* testimony" devoid of any empirical basis or discernable methodology. ECF No. [80] at 9. Defendants respond that Holman "relies on peer-reviewed research and reputable polls[.]" ECF No. [88] at 8. Holman's primary support for his opinion relating to the In-Office Restrictions is a series of Gallup News Service polls which reveal that only 5-8% of respondents opined that lobbyists had high "honesty and ethical standards." ECF No. [87-12] at 24-25. The poll says nothing about the appearance of corruption or lobbyists serving in public office. If the public's supposed distrust of lobbyists justifies a prohibition against their holding office, as Holman apparently assumes, then "Telemarketers" and "Car salespeople," who received similar ratings on the Gallup polls, would likewise be prohibited. ECF No. [87-12] at 24-25.

Holman also cites a poll conducted by the University of Maryland School of Public Policy. ECF No. [87-12] at 52. That poll asked respondents how convincing they considered various arguments for extending limits on lobbying by Members of Congress and Executive Branch officials after they leave office. *Id*. The poll does not address in-office lobbying, nor does it mention corruption.

The Court agrees with Plaintiffs that Holman has described no reliable methodology upon which he bases his opinions. "[A]n expert opinion is inadmissible when the only connection between the conclusion and the existing data is the expert's own assertions[.]" *McDowell v. Brown*, 392 F.3d 1283, 1300 (11th Cir. 2004) (citation omitted). As plaintiffs put it, Holman "merely read the survey results and leaped to the conclusion that lobbying equals corruption or its appearance." ECF No. [80] at 16. Even if the polls show, as Holman and Defendants assert, that "[t]he public does not trust lobbyists," ECF No. [85] at 9, such distrust does not demonstrate that the public believes lobbyists are more likely to engage in corruption. Holman's testimony is inadmissible

because his conclusions are based on "unsupported assumption[s]" rather than reliable methodology. *Buland v. NCL (Bahamas) Ltd*, 992 F.3d 1143, 1151 (11th Cir. 2021).

### 4.  The State's Evidence

The Court turns to the evidence presented by the State to demonstrate that the In-Office Restrictions are in fact "narrowly tailored to serve" the compelling interest of preventing *quid pro quo* corruption or its appearance. *Otto*, 981 F.3d at 868 (quoting *Reed*, 576 U.S. at 163). "Because the Government is defending a restriction on speech as necessary to prevent an anticipated harm, it must do more than simply posit the existence of the disease sought to be cured." *Cruz*, 142 S. Ct. at 1653 (quotation marks omitted). "It must instead point to record evidence or legislative findings demonstrating the need to address a special problem." *Id*. (quotation marks omitted).

Defendants do not direct the Court to any "legislative findings." *Id.* The Implementing Statutes have none. Fla. Stats. §§ 112.3121-112.3122. While the preamble to Section 8 of the Florida Constitution states that the provisions within Section 8 are intended "[t]o assure" the "public trust" in public office, that preamble predated the Amendment. ECF No. [87-9] at 1. Moreover, as explained above, the general interest of furthering "public trust" in government is distinct from the compelling interest of preventing *quid pro quo* corruption or its appearance. *Cruz*, 142 S. Ct. at 1653. In sum, the In-Office Restrictions are unsupported by any "legislative findings demonstrating the need to address a special problem." *Id.* (quotation marks omitted).

Turning to the record evidence, Defendants argue that seven pieces of evidence demonstrate the necessity of the In-Office Restrictions: (a) a Grand Jury Report addressing the Broward County School Board, (b) a Report from the Florida Public Corruption Study Commission, (c) a Corruption Risk Report published by Integrity Florida, (d) the transcripts of the CRC hearings, (e) the testimony of Defendant Don Gaetz, (f) minutes of Miami Shores Village

Council meetings, and (g) evidence regarding the popularity of the Amendment. Plaintiffs contend that Defendants' evidence fails to demonstrate that the In-Office Restrictions are narrowly tailored to address *quid pro quo* corruption.

### a. Grand Jury Report

Defendants introduce the Final Report of the Nineteenth Statewide Grand Jury in the Supreme Court of the State of Florida, Case No. SC09-1910. ECF No. [87-16] ("Grand Jury Report"). According to the original sponsor of the Amendment, Defendant Don Gaetz, the Lobbying Restrictions were intended to address "serious deficiencies" identified in the Grand Jury Report. ECF No. [87-21] at 74.

The Grand Jury Report, published in 2011, was the result of an investigation into "the functioning of the Broward County School Board and of the Broward County School District." ECF No. [87-16] at 1. The Grand Jury Report found "overwhelming" evidence of "gross mismanagement and apparent ineptitude of so many individuals at so many levels[.]" *Id.* at 2. As relevant here, the Grand Jury stated: "we are reluctantly compelled to conclude that at least some of this behavior can best be explained by corruption of our officials by contractors, vendors and their lobbyists." *Id.* at 2. It concluded with 21 recommendations to improve the Broward County School Board's management and to insulate it from improper influence. *Id.* at 50-51. Only one of those recommendations relates to lobbying: a prohibition on "gifts of any value to any Board member or District employee from anyone doing business with the District or lobbying the Board[.]" *Id.* at 51.

There is no indication that any of the Broward County School Board members were employed as lobbyists, and there is no suggestion that they were lobbied by other public officials. Thus, while the Grand Jury Report generally evinces the corruptive potential of unregulated

lobbying, it does not demonstrate the "specific problem" of lobbying by public officials. *Cruz*, 142 S. Ct. at 1653 (quotation marks omitted). Therefore, it is not evidence that the In-Office Restrictions are "narrowly tailored to serve" the compelling interest of preventing *quid pro quo* corruption or its appearance. *Otto*, 981 F.3d at 868 (quoting *Reed*, 576 U.S. at 163).

### b. Report from the Florida Public Corruption Study Commission

Defendants cite to a Report issued by the Florida Public Corruption Study Commission ("FPCSC"). ECF No. [87-15]. The FPCSC was established by Governor Jeb Bush in 1999 "to complete a comprehensive review of current laws, policies and procedures related to Florida's response to public corruption, and prepare specific recommendations on how Florida might better prevent and respond to acts of public corruption." *Id.* at 1.

The FPCSC Report briefly discusses lobbying within the context of "revolving door" legislation, which prohibits local elected officials "from lobbying the 'governing body' of which they were an officer during the two-year period after leaving office." *Id.* at 57. The Report recommends strengthening Florida's then-existing "revolving door" limitation by clarifying that local elected officials are prohibited from lobbying "not just" their "former colleagues, but also employees of the agencies they formerly headed." *Id*. at 58. The Report also recommends "adopting a standard similar to Federal law, which prohibits former employees from participating in a matter in a way that is adverse to their former agency where the employee had participated personally and substantially in the employee's official capacity." *Id*. at 57.

The Report does not address lobbying by currently-serving officials, and its recommendation relating to post-lobbying restrictions is limited to the situation of former elected officials lobbying "employees of the agencies they formerly headed." *Id.* at 58. The FPCSC Report therefore provides no support for the In-Office Restrictions' far broader prohibition against

lobbying before other governing bodies within Florida and at the federal level. Therefore, it fails to support Defendants' position that the In-Office Restrictions are narrowly tailored to prevent *quid pro* quo corruption or its appearance.

### c. Corruption Risk Report

Defendants introduce a study entitled *Corruption Risk Report: Florida Ethics Laws*, published by Integrity Florida, "a nonprofit, nonpartisan research institute whose mission is to promote integrity in government and expose public corruption." ECF No. [87-17] at 1 ("Corruption Risk Report"). According to the Corruption Risk Report, "Florida led the U.S. in federal public corruption convictions from 2000-2010[.]" *Id*. at 2. The Corruption Risk Report states that "Florida faces a corruption crisis that threatens the state's reputation, its economy and its ability to attract new jobs and capital." *Id*. at 2. The Corruption Risk Report contains thirteen recommendations, none of which relate to lobbying by public officials. *Id.*

However, the Corruption Risk Report does contain one relevant "Additional Question[ ] for Policymakers to Consider":

> Where should the conflict of interest line be drawn for state legislators? Presently, state legislators are allowed to receive income from lobbying firms or organizations with state government lobbyists.

*Id*. at 10. This question evinces a concern that is arguably addressed by the In-Office Restrictions, namely, that state legislators could have a "conflict of interest" if they receive income from lobbying firms. However, it is not evidence that the problem exists. Moreover, the In-Office Restrictions are a poor fit to address the stated concern, because the In-Office Restrictions permit a state legislator to continue receiving income from lobbying firms as long as the state legislator does not lobby on the three prohibited topics. *See Reed*, 576 U.S. at 172 ("[A] law cannot be regarded as protecting an interest of the highest order, and thus as justifying a restriction on truthful

speech, when it leaves appreciable damage to that supposedly vital interest unprohibited[.]"). Finally, the Corruption Risk Report's general discussion of corruption in Florida does not demonstrate that in-office lobbying is the cause of that problem. *See Brown*, 564 U.S. at 800 (rejecting studies that show "at best some correlation," as opposed to causation, between the regulation and the asserted harm).

### d. Constitution Revision Commission Hearings

Defendants introduce the transcripts from the public hearings before the Constitution Revision Commission ("CRC"), which ultimately approved the Amendment. ECF Nos. [87-19], [87-20], [87-21].

The sponsor of the Amendment, Defendant Don Gaetz ("Gaetz"), explained that the purpose of the Amendment was "to nail shut the revolving door between public office and private lobbying, between heading an agency and then turning around and lobbying the agency you headed, between serving on the County Commission while simultaneously lobbying another local government that has interconnected interests." ECF No. [87-20] at 115. "In my view," Gaetz explained, "we ought to take a stand in the state of Florida and say you are either a lobbyist or you are an official." ECF No. [87-21] at 87.

Gaetz's comments before the CRC are most helpful in revealing the origins of the Amendment's limitation to lobbying for compensation on "issues of policy, appropriations, and procurement." ECF No. [87-20] at 114. A prior version of the Amendment had prohibited "representation for compensation." *Id*. Following discussions with advisors, Gaetz became concerned that "representation for compensation" might be "interpreted to prohibit the practice of law in some ways, or even other professions like accountancy or engineering." *Id*. at 114-15. To

avoid any such interpretation, the term was replaced with "lobbying for compensation on issues of policy, appropriations, and procurement." *Id*. at 114.

At a different hearing, a CRC Commissioner asked if Gaetz was "aware of abuses, any specific examples . . . that prompts" the Amendment. ECF No. [87-21] at 83. Gaetz responded with the following example:

> In my own county we have had a circumstance in which an individual served on the County Commission and the day, literally the day after he left office, he became a lobbyist for the company that had the garbage contract. And as a County Commissioner he voted on that very same contract and then turned around and became their lobbyist to his former colleagues.

*Id*. at 83-84. Gaetz stated that he had additional examples of City Commissioners who "have done the same thing," but he did not elaborate. *Id*. at 84.

Another Commissioner asked whether "the State Constitution [can] prohibit somebody from lobbying before the Federal Government or federal agency?" *Id*. at 85. Gaetz responded that he is "not a lawyer," but he believed the prohibition was permissible. *Id.* He then added: "Sadly, we have had instances and do have instances where sitting members of the Legislature have been registered lobbyists before other levels of government." *Id.*

Gaetz's statements support Defendants' contention that the Amendment "was developed with the specific intent of limiting the Amendment's impact on the practice of law." Def. SMF ¶ 36, ECF No. [86]. Accepting Gaetz's statements as true, in limiting the In-Office Restrictions to "issues of policy, appropriations, and procurement," the CRC merely intended to exclude certain types of representation—principally the practice of law—from coverage. In other words, the CRC did not *intend* to create a law that discriminates on the basis of speech.

However, regardless of its intentions, the CRC did propose an amendment that "is content based on its face." *Reed*, 576 U.S. at 164; *see supra* Part B(ii). Other states have managed to

exclude the practice of law from lobbying restrictions without creating a content-based regulation of speech. *See, e.g.*, N.H. Rev. Stat. Ann. § 21-G:25(III)(a) (exempting "[a]ppearances before courts or any adjudicative proceedings"). Moreover, Defendants have not provided an explanation as to how limiting the Lobbying Restrictions to "issues of policy, appropriations, and procurement" is an effective way of accomplishing the CRC's purported goal of excluding the practice of law from the scope of the In-Office Restrictions.

As for Gaetz's example of the County Commissioner who "became a lobbyist for the company that had the garbage contract," ECF No. [87-21] at 83, that example relates to the "revolving door" issue addressed by the Post-Office Restrictions. It does not address the issue of public officials lobbying while in office. Moreover, "a few stray floor statements are not the same as 'legislative findings' that might suggest a special problem to be addressed." *Cruz*, 142 S. Ct. at 1654 (citation omitted).

### e. Post-Hoc Testimony of Don Gaetz

Next, Defendants introduce Gaetz's deposition testimony from April 2023. ECF No. [87-8]. Gaetz explained that he

> developed the concept for [the Amendment] in response to experiences he had during the course of his own political career, reporting he had observed on various political scandals in Florida, reports from both government and non-government organizations on public corruption in Florida, and discussions he had with colleagues and constituents specifically regarding concerns about public officers of Florida lobbying while in-office.

Def. SMF ¶ 33, ECF No. [86].

Gaetz explained why he felt it was necessary for the In-Office Restrictions to prohibit a public official from lobbying any governmental body in Florida or at the federal level during his time in office. He provided an example of a "mayor of one town lobbying for a private interest in

another town." ECF No. [87-8] at 85. "[T]hose two towns compete for the same dollars for a variety of things before the Legislature and, for that matter, in some instances, before Congress." *Id.* "And so, you, therefore, have a built-in context for a conflict of interest." *Id*.

Gaetz opined that the In-Office Restrictions prohibit conduct other than *quid pro quo* corruption. He testified: "I'm not suggesting that there's money exchanged for political favors. I'm suggesting there are conflicts of interest between the public official's responsibilities and the operations of his public entity and what he may be doing as a lobbyist for private interests before other public bodies." ECF No. [87-8] at 124-25. Plaintiffs argue that, in this statement, Gaetz "frankly admitted that the Lobbying Restrictions reach beyond *quid pro quo* corruption, and prohibit conduct that may create the appearance of a conflict of interest—a lesser standard." ECF No. [82] at 9.

The Court agrees with Defendants that Plaintiffs accord undue weight to Gaetz's choice of words. ECF No. [94] at 6. Gaetz's use of the term "conflict of interest" as opposed to "*quid pro quo* corruption" does not "conclusively establish[ ] that the In-Office Lobbying Restrictions do not serve a compelling state interest," as Plaintiffs contend. ECF No. [82] at 11. Preventing *quid pro quo* corruption and eliminating conflicts of interest are overlapping interests, so the fact that one interest is furthered does not preclude the other's advancement as well.

However, Gaetz's testimony does not support Defendants' position either. Gaetz's example of the conflicted mayor is "far too speculative" to support Defendants' burden of showing that the In-Office Restrictions are narrowly tailored to prevent *quid pro quo* corruption or its appearance. *McCutcheon*, 572 U.S. at 210 ("[W]e have never accepted mere conjecture as adequate to carry a First Amendment burden." (quotation marks omitted)). Moreover, if "floor statements" from Members of Congress carry minimal evidentiary weight in the strict scrutiny analysis, even less

weight should be afforded to a legislator's post-hoc testimony produced during a lawsuit challenging the law. *Cruz*, 142 S. Ct. at 1654.

### f.  Miami Shores Village Council Meetings

Defendants introduce the minutes from meetings of the Miami Shores Village Council to demonstrate citizens' disapproval of the lobbying activities of former Plaintiff Crystal Wagar, a lobbyist who resigned from the Village Council prior to the In-Office Restrictions going into effect. Defendants assert that the comments of two Miami Shores citizens reveal that the public "connect[ed] Crystal Wagar's [lobbying] activities with the appearance of corruption." Def. SMF ¶¶ 60-62, ECF No. [86]. Plaintiffs respond that Defendants "grossly mischaracterize the evidence" relating to Ms. Wagar. ECF No. [96] at 11.

Having fully reviewed the Miami Shores Village meeting notes introduced by Defendants, ECF Nos. [87-23], [87-24], the Court agrees with Plaintiffs. The comments cited by Defendants reveal that *one* Miami Shores resident mentioned corruption, on two separate occasions, related to the Village Council's attempt to pass a Comprehensive Plan. ECF No. [87-23] at 16; ECF No. [87-24] at 16. In *one* of those two statements, the resident expressed regret for having "voted and supported Vice Mayor Marinberg . . . as well as Crystal Wagner [sic]." ECF No. [87-23] at 16. There is no mention of Wagar's employment as a lobbyist. Defendants' conclusion that Miami Shores residents linked Wagar's employment with *quid pro quo* corruption is "mere conjecture," unsupported by the evidence presented. *McCutcheon*, 272 U.S. at 210 (quotation marks omitted).

### g.  The Popularity of the Amendment

Lastly, Defendants point to evidence that "the tremendous majority of Florida voters who supported the amendment kn[ew] it targeted not just state legislators, but local officials." ECF No. [98] at 5. It is true that 78.9% of Floridians voted in favor of the Amendment. ECF No. [36-1].

However, the Court is not evaluating the popularity of the In-Office Restrictions, but rather its constitutionality. The fact that the majority of Floridians supported the Amendment does not constitute evidence that it is narrowly tailored to address the problem of *quid pro quo* corruption or its appearance.

### 5.   The In-Office Restrictions Do Not Pass Strict Scrutiny

Having carefully reviewed the evidence Defendants have submitted,[8] the Court concludes that Defendants have failed to meet their burden. The only evidence that addresses the Court's overbreadth and overinclusive concerns is the testimony of Defendant Gaetz. However, his unsupported statements amount to "mere conjecture," which is not "adequate to carry a First Amendment burden." *McCutcheon*, 572 U.S. at 210 (quotation marks omitted)). The remainder of Defendants' evidence amounts to a "handful of media reports and anecdotes" that do not address in-office lobbying at all. *Cruz*, 142 S. Ct. at 1653; *see also Brown*, 564 U.S. at 800 ("ambiguous proof will not suffice"). The Court concludes that Defendants have failed adduce evidence that the In-Office Restrictions are "narrowly tailored to serve compelling state interests." *Otto*, 981 F.3d at 862 (quoting *Reed*, 576 U.S. at 163). Therefore, they fail to pass strict scrutiny and are in violation of the First Amendment.

In general, "[l]egislation designed to prohibit and to avoid potential conflicts of interest in the performance of governmental service is supported by the legitimate interest in maintaining the public's confidence in the integrity of [government] service." *Crandon v. United States*, 494 U.S.

---

[8] In addition to the evidence discussed above, the Court has reviewed the additional exhibits submitted but not discussed by Defendants in their briefing. *See, e.g.*, ECF No. [87-3] (deposition testimony of Steve Geller); ECF No. [87-5] (disposition testimony of Kerrie Stillman); ECF No. [87-25] (April 10, 2008 article by Bob Norman regarding Steve Geller). None of these exhibits demonstrate that the In-Office Restrictions are narrowly tailored to prevent *quid pro* quo corruption or its appearance.

152, 164-65 (1990). Laws prohibiting lobbying by public officials are both commonplace and appropriate "to prevent . . . the appearance of wrongdoing[.]" *Id.* at 164. Such laws further a significant government interest in addressing the appearance of impropriety and would likely survive some version of *Pickering/NTEU* balancing, which, as the Court previously explained, ECF No. [52] at 14, would be appropriate for content-neutral lobbying restrictions.

However, the In-Office Restrictions are not content neutral because they facially discriminate by subject matter. Defendants have failed to meet their burden under a strict scrutiny analysis of demonstrating that the In-Office Restrictions are narrowly tailored to serve compelling state interests.

### C. Remedy

Plaintiffs assert that they "are entitled to a permanent injunction prohibiting Defendants from enforcing the In-Office Lobbying Restrictions." ECF No. [82] at 20. Defendants do not respond to Plaintiffs' assertion that all four permanent injunction factors weigh in their favor.

In this case, each of the four permanent injunction factors are met. *See Byrd*, 608 F. Supp. 3d at 1156. The first factor, irreparable harm, is satisfied because "[t]here is irreparable harm whenever First Amendment rights are curtailed." *Id.* (citing *Scott v. Roberts*, 612 F.3d 1279, 1295 (11th Cir. 2010)). Second, no adequate remedy at law exists because the chilling of speech cannot be undone through monetary remedies. *Barret v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209, 1230 (11th Cir. 2017). As for the third and fourth factors—balance of the hardships and the public interest—"[t]he State suffers no harm when a court precludes it from violating the Constitution," and the public interest is not furthered by enforcement of an unconstitutional law. *Byrd*, 608 F. Supp. 3d at 1157 (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Accordingly, Plaintiff has demonstrated entitlement to a permanent injunction.

The remaining issue is the appropriate scope of the preliminary injunction. Defendants argue that "the scope of any relief afforded to Plaintiffs by this Court should be limited only to Plaintiffs with standing to challenge the Amendment." ECF No. [85] at 21. Plaintiffs respond that there is a "*realistic danger* that the [In-Office Retrictions] will significantly compromise recognized First Amendment protections of parties not before the Court." *Tracy v. Fla. Atl. Univ. Bd. of Trs.*, 980 F.3d 799, 810 (11th Cir. 2020) (emphasis in the original; quotation marks omitted).

Plaintiffs are correct. They have demonstrated "from the text of the law" that the In-Office Restrictions are content-based, overboard restrictions on speech. *Id*. "[A] statute found to be overbroad is 'totally forbidden until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression.'" *FF Cosmetics FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1300 (11th Cir. 2017) (quoting *Broadrick*, 413 U.S. at 613. No reasonable limiting construction is apparent in this case. The appropriate remedy, therefore, is to permanently enjoin enforcement of the In-Office Restrictions.

## V.    CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Plaintiffs' *Daubert* Motion, **ECF No. [80]**, is **GRANTED**.

2. Plaintiffs' Motion for Summary Judgment and Permanent Injunction, **ECF No. [82]**, is **GRANTED**.

3. Defendants' Motion for Summary Judgment, **ECF No. [85]**, is **DENIED**.

4. Defendants, together with their officers, agents, servants, employees, and attorneys, as well as all other persons who are in active concert or participation with any of the foregoing individuals, are **PERMANENTLY ENJOINED** from enforcing Article II, Section 8(f)(2) of the Florida Constitution.

Case No. 22-cv-24156-BLOOM/Otazo-Reyes

5.  Pursuant to Federal Rule of Civil Procedure 58(a), the Court will enter Final Judgment

separately.

**DONE AND ORDERED** in Chambers at Miami, Florida, on August 9, 2023.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record

40